The opinion of the court was delivered by
Nicholls, C. J.
Mrs. Anna Castleman claims that her sister, Mrs. Thomas L. Airey, should be held to collate twenty thousand dollars.
On the 3d of November, 1860, a marriage contract was entered into between Miss Virginia Carroll, daughter of D. R. Oarroll, and Thomas L. Airey. The father intervened in the act, declaring that he thereby settled upon the intended wife, as dowry, the sum of twenty thousand dollars. Thomas L. Airey in the act acknowledged to have received said amount from D. R. Oarroll in ready money then and there paid, and consented to remain charged with the same.
On the 4th of October, 1892, Airey and wife and D. R. Oarroll appeared before Samuel Flower, notary public, and two witnesses, and an act was passed in which, after reciting the marriage contract above mentioned and the acknowledgment therein of Thomas L. Airey that he had received the twenty thousand dollars settled as dowry, the parties severally declared “that by mutual consent and agreement by and between all the said parties the said sum of twenty thousand dollars had been returned and paid back by the said Thomas L. Airey to the said D. R. Oarroll, who acknowledged the receipt thereof; that accordingly the donation made by the said D. R. Oarroll to said Virginia Carroll of the said sum of twenty thousand dollars dowry is hereby forever revoked and dissolved, and the settlement of dowry made in the said marriage contract is hereby declared to be null and void, and the said donation and settlement of dowry are hereby settled.”
In answer to interrogatories on facts and articles propounded to her, Mrs. Thomas L. Airey declared “the money in question, twenty thousand dollars, was returned long before (before the date of the act passed before Samuel Flower) to my father by Mr. Thomas L. *961 Airey — in fact it was returned to my father by Mr. Airey on November 3, 1860, immediately after the signing of the marriage contract before Oharles Springer, notary public. My father had handed over the twenty thoasand dollars in currency notes, and after the signing of the marriage contract Mr. Airey returned the identical money to my father * * * This was done in my presence before leaving the place the signing took place.”
The opponent, Mrs. Castleman, invokes Art. 2329 of the Oivil Oode against the defence set up on behalf of Mrs. Airey. She also calls to our attention the fact that at the date of the act before Flower, the wife of D. R. Oarroll was no longer living, and contends that D. R. Carroll was powerless to revoke the settlement of dowry so far as the succession of Mrs. D. R. Oarroll was concerned. Art. 2329 of the Oivil Code is as follows:
“ Every matrimonial agreement can be altered by the husband and wife jointly before the celebration of marriage, but it can not be altered after the celebration.”
We do not think that the provisions of that article have any application to the matter now before the court. It is true that in the act before Flower the parties declare that the donation made by the father in the marriage contract was thereby “revoked;” but the question is one of the reality of the original donation rather than one as to its revocation, and whether or not twenty thousand dollars passed or was intended seriously to pass from Daniel R. Oarroll to Thomas L. Airey for or on account of his wife. Laurent, in his work Du Contrat de Mariage (Laurent Code Oivil, Vol. 21), after discussing at some length the irrevocability of marriage contract, says on p. 110, Sec. 86: “ Le contrat de mariage contient parfois des énonciations fausses; il constate un apport qui n’a pas été fait, il donne quittance d’une dot qui n’a pas été payée. Faut-il appliquer, dans oes cas, le principle de l’immutabilité des conventions matrimoniales et maintenir les déclarations qui s’y trouvent jusqu’a ce que les parties intéressées les aient détruites par l’inscription en faux ? A notre avis, l’article 1395 est hors de cause, et on a tort de l’invoquer; on ne déroge pas a une convention par la convention méme. La véritable question porte sur une difficulté de preuve. L’acte fait-il foi jusqu’a l’inscription de faux de l’apport et du payement de la dot ? La négative est certaine; elle résulte des principes qui régissent la force probante des actes authentiques. *962 L’acte fait foi, jusqu’a inscription de faux, du fait matérial de la déclaration, il ne prouve que jusqu’a preuve contrairela vérité de la déclaration. On peut done soutenir sans devoir s’inscrire en faux, que l’apport constaté au contrat de marrage n’a pas été fait, que le payement de la det a été fictif.
In Dalloz & Vergé “ Code Oivil Annoté,” we find the following authorities on that subject: Dalloz & Vergé, under Article 1395,C. N. No. 96: “ De ce que le contrat de mariage est irrévocable, il ne suit nullement qu’on doive réputer sinceres et vraies toutes les énonciations qu’il contient. Il peut étre argué de simulation par les tiers, et la preuve contraire recevable soit par témoins, soit par un ensemble de présomptions graves, précises et concordantes (Jurisprudence Générale Contr. de Mariage 381).
No. 98. * * * “Est contestable par les autres enfants la mention portée dans le contrat de mariage de l’un d’eux, et qui désigne le beau-pére de la future comme ayant repu la dot constitueé á celleci, quand réellement il n’a rien repu et qu’il n’a été constitué aucune dot, et la preuve peut résulter, entre autres présumptions, d’une contre-lettre non revétue des formalités exigées par les Articles 1395 et 1396 Gode Civil.”
Req. 5, Janv., 1831. Jurisprudence Générale. Contrat de Mariage, 382.
No. 99. “Une cour a pu, sans porter atteinte á l’immutabilité des conventions matrimoniales, dispenser du rapport á une succession une dot constituée par contrat de mariage si le payement de cette a été simulé.”
Req. 13 Juin, 1831. Jurisprudence Générale. Contrat de Mariage, 383.
No. 100. “Si les énonciations contenues au contrat de mariage sont contestables par simulation, la preuve de la simulation ne résulte pas nécessairement de la contre-lettre postérieure du mariage qui reconnaítrait la fausseté des énonciations.” Jurisprudence Générale. Contrat de Mariage, No. 384. Dalloz & Vergé under Art. 1122, C. N.
No. 27. * * “La déclaration du défunt qu’il n’a pas versé et qu’il était dans l’impossibilité de payer la somme par lui donnée á terme á l’un de ses enfants dans son contrat de mariage est opposable aux autres enfants, qui ne peuvent, des lors, exiger le rapport de la somme donnée lorsqu’ils n’articulent contre cette déclaration aucuns *963 faits partieuliers de fraude.” Req. 20 Janvier, 1864, D. P. 65 1222. Dalloz & Vergé under Art. 1438, C. N., No. 56.
“En presence de la déclaration dn défunt qu’il n’a pas payé la somme par lui donnée á terme a l’un de ses enfants par contrat de mariage, il n’y a pas lieu de demander le rapport de cette somme.”
In the case at bar there is neither question of fraud involved nor of interference with the rights of forced heirs. The heirs other than the opponent recognizes that the money was really returned to D. R. Carroll, as stated by Mrs. Airey in her testimony, and the return of the money was evidently before the celebration of the marriage of Airey to Miss Carroll. We are of the opinion that the District Court correctly held Mrs. Airey not liable for the collation of this amount. Collation is based upon the theory that the person collating had withdrawn from the parent money or property which otherwise would have gone to swell the mass of the succession. It would be gross injustice to hold Mrs. Airey liable for an amount which neither she nor her husband had actually received. Mrs. Castleman moved to strike out a portion of the answers of Mrs. Airey to interrogatories on facts and articles, on the ground that they were not responsive to the questions asked; that she was seeking to prove by parol matters and things which could only be shown by written evidence over the signatures of D. R. Carroll and wife; that the statements were in conflict with the statements and acts of Mrs. Airey and her husband in certain acts of sale, and that Mrs. Airey was estopped thereby from claiming or asserting that the twenty thousand dollars dowry had ever been returned. We think the action of the court in over-ruling the objection was correct. Mrs. Castleman herself resorted to interrogatories on facts and articles, and she could not object to answers she had herself solicited. When Mrs. Airey did answer, she had the right, under Art. 353 C. P., in doing so, to state any fact tending to her defence, provided they were closely linked to the fact on which she was being questioned. We think her answers were so closely linked and they were admissible. Mrs. Castleman overlooked the fact that all the parties themselves to the original act, did, subsequently, by notarial act, recite the fact of the return of the money referred to as having been received as dowry, and that one of those parties was her father, through whom she was claiming as an ordinary heir. Mrs. Airey had a perfect, right, in her answers, to fix the time of the return of *964 the money. There was nothing done by Mrs. Airey in the acts referred to which estopped her from setting up the return of the twenty thousand dollars by her husband to her father.
Mrs. Oastleman claimed in the District Court that Charles Y. Carroll should be held to a collation of seventy-eight thousand eight-hundred dollars. - In this court “ it is submitted that he should be condemned to pay twenty-two thousand four hundred and fifty-nine dollars.”
In the brief filed in her behalf, it is said: “ We have no evidence but the answers of Charles Y. Carroll to interrogatories on facts and articles. Now what does he admit he has received? All of his-answers must be read together to get a clear idea of the situation and of bis manner of replying. They are not full, frank, or explicit, and the interrogations, to a large extent, should be taken for confessed.”
We have compared the answers and questions, and while some portions of the latter have not been covered, we think that they have been substantially responded to in respect to all material points. Had more definite answers been desired, proceedings to-that effect could have been taken. We discover no purpose to evade the questions. Our attention having been directed specially to a-statement made at one time by Mr. Charles V. Carroll, that the agreements between himself and his father in regard to the profits of - theEscobal factory had been made in January, 1887, and to a subsequent admission by him, to the effect that the written acknowledgment of his father touching that matter, which he produced in court, and which was dated January, 1887, had been, in reality, made out and signed in 1892, we do not attach the same importance to this difference of statement that counsel does. We think the paper made-in 1892 was intended as an acknowledgment or recognition of an antecedent agreement made in 1887. We do not think that the answers to the questions have been successfully attacked. This conviction carries with it an affirmance of the judgment of the District Court as to this particular collation.
The claim of the different heirs that Mrs. Oastleman should be charged with a collation of twenty-five thousand dollars as the value of the Coosa plantation, alleged to have been a disguised donation to her from her father in the form of an onerous contract of sale to her husband, T. W. Oastleman has caused to be brought before us an *965 immense record, a large part of which requires no special allusion to under the conclusions which we have reached.
On December 31, 1879, Daniel R. Carroll sold to his son-in-law T. W. Castleman, the Coosa plantation in the parish of Concordia, for ■eight thousand five hundred dollars; two thousand dollars being -cash and the balance represented by two promissory notes of three thousand dollars each, secured by special mortgage on the property.
On the 19th of December, 1882, T. W. Castleman executed a special mortgage on this property in favor of D. R. Carroll, to secure the payment of two promissory notes, each for five thousand dollars.
On January 5, 1886, T. W. Castleman sold the plantation to Stanley O. Thomas (the husband of a sister of Castleman’s wife) for ■eight thousand dollars cash.
On the 3rd of March, 1892, S. O. Thomas sold the property to W. H. Hudnall and Mrs. E. Castleman (the wife of a brother of T. W. Castleman) for nine thousand five hundred dollars; five thousand dollars cash and the balance of four thousand five hundred dollars represented by two promissory notes, secured by special mortgage. T. W. Castleman appeared as the agent of Thomas in- making this sale.
On January 7, 1886, D. R. Carroll executed a receipt for the sum of eight thousand eight hundred and eighty-eight dollars as “ being amount due him in full on two promissory notes for the sum of three thousand dollars, each dated December 31, 1879, due and payable one and two years after date, with eight per cent, interest from date until paid; said two notes are secured by mortgage on the Coosa plantation, and were given to secure balance of purchase price by act passed before N. B. Trist, notary public, on the 31st day of December, 1879. This receipt is given on account of my not being able to find said notes at this time to deliver to him.
On the 29th of February, 1888, D. R. Carroll and T. W. Castleman made affidavit before Trist, Notary, to the following effect:
“ We, the undersigned, Thomas W. Castleman and Daniel R. Carroll, do on oath, declare that the two notes made by said Castleman to his own order and by him endorsed, dated April 5th, 1882, each for the sum of five thousand dollars, payable respectively at the Canal Bank, on the 15th of December, 1882, and 1st of January, 1883, and secured by mortgage on the hereinafter described property in *966 favor of said Oarroll, have been paid and satisfied, but that the same have been mislaid and can not on that account be produced, and the said Oarroll, as the last holder and owner thereof, and as the party in whose hands the said notes were paid does hereby authorize and empower the recorder of the parish of Concordia and Tensas to erase and cancel from the records of their offices the mortgage which to secure the payment of said notes the said Oastleman granted in favor of said Oarroll by act before N. B. Trist, notary public, in New Orleans, dated December 19, 1882, on the following described property: (Here follows a description of the property mortgaged, being the Ooosa plantation aforementioned, several lots in the town of St. Joseph and Tensas parish, and all the right, title and interest of T. W. Oastleman in the succession of T. L. Oastleman.)
On the 12th January, 1889, D. R. Oarroll obtained a judgment in the District Oourt for the parish of Tensas, against Thomas W. Oastleman for the sum of fifteen thousand dollars. On the 9th of January, 1894, D. R. Oarroll transferred, for five hundred dollars, his interest in said judgment (D. R. Oarroll’s wife having in the meantime died) to Anna Oastleman, wife of T. W. Oastleman.
On October 9th, 1889, Mrs. Anna Oastleman, on.an allegation that her husband’s affairs were in a disordered condition, resulting from the disasters which had lately befallen the country, and that since his marriage she had received in cash from her father the sum of one thousand dollars, the same being a manual gift which her said husband had used in his planting business, obtained a judgment of separation of property from her husband, and a dissolution of the community, and a monied judgment against him for nine hundred and thirty dollars. From the evidence it appears that Stanley O. Thomas acted as the commission merchant of Thomas W. Oastleman for the Ooose plantation, from the time of his purchase of the same up to the sale of the plantation, on March 3, 1892, by Thomas himself to Hudnall and Mrs. E. Oastleman — the property though standing in the name of S. O. Thomas being really that of Oastleman, as will be afterwards mentioned. That Thomas W. Oastleman, in addition to owning the Ooosa plantation, was the lessee of a plantation in the parish of Madison, known as the “ Mound plantation,” and that D. R. Carroll was the commission merchant of Oastleman in respect to the Mound plantation business; that the ten thousand dollars mortgage which has been referred to was given to secure D. R. Oarroll *967 against Oastleman’s indebtedness to him as arising from that business, and that the fifteen thousand dollars judgment against Castle-man was a judgment based on indebtedness to Carroll by Castleman on account of the same business.
It appears that Castleman in the course of his business became indebted to his factor S. O. Thomas, and that the transfer to the latter, though apparently a sale was in reality a security to Thomas for his claim. The property was ostensibly bought by Thomas for eight thousand dollars cash. He says he gave his check for that amount payable to the order of Castleman; that Castleman passed this check by endorsement over to D. R. Carroll; that Carroll gave him (Thomas) his own check for the same amount. Prior to that time, Castleman had obtained from D. R. Carroll possession of the two mortgage notes which represented the credit portion of the purchase of the Coosa plantation from Carroll to himself, and had handed them to Thomas as-collateral, to secure his indebtedness to him. Thomas held the notes at the time of the transfer to him of the plantation, but they were at that time misplaced. They were finally delivered to Castleman. Thomas wrote out a counter-letter when the property was placed in his name, in which he recognized that he held it only by way of security. When Thomas sold the property in 1892 to W. H. Hudnall and Mrs. E. Castleman, he received out of the price four thousand dollars cash, which he .credited to Castleman’s indebtedness, and he turned over the two mortgage notes to Castle-man himself, one thousand dollars of the price went to Castleman’s brother on account of some relations between the two. Thomas subsequently purchased these two notes from Castleman for himself and some third person not named. According to bis testimony he did so, because Castleman told him he wanted to buy a piece of property, “the home (said the witness) in which he now lives.”
Thomas says that when the property was transferred to him, he held the original two notes representing the purchase price of Coosa and showed them to D. R. Carroll, who told him that Castleman had paid no portion of the purchase price of that plantation. A large part of the record brought up consists of letters which passed between Castleman and D. R. Carroll, both before and after the sale of the Coosa plantation to Castleman, which conclusively establish, in the opinion of the heirs advancing the claim against Mrs. Castleman when taken in connection with the other testimony in the case, the *968 fact that the act of sale of the Ooosa plantation to Oastleman was a disguised donation from D. R. Oarroll to Mrs. Oastleman, through her husband. There was unquestionably a desire on the part of the father, prior to the sale to the husband, to make a donation of the property to the daughter, and an undoubted willingness on the part of the son-in-law to receive it,.though not in the form which Oarroll had proposed this should be done. Oastleman, himself, suggested to Oarroll that a sale shouid be made to himself, and the notes should be sent or given to the wife; that he would then aeknowlledge himself indebted to his wife for the amount of the notes, or a larger amount if it were though advisable; Oastleman’s object evidently being to own the property and to hold it protected against claims against himself, which might thereafter arise by recording a mortgage claim against himself in favor of his wife. Oastleman testifies that the matter was abandoned in consequence of advice received from his iriend, Judge Spencer, and that thereupon an actual sale of the property was made to him, though, as he says, for an amount considerably less than the value of the property, Oarroll saying he had .done as much for his other sons-in-law. He says he promised Carroll that he would not sell the place without his consent; also, that he would give his wife the benefit of any excess in value in the place should he sell it. There, are in a number of letters written by Oastleman to Carroll after the, sale, expressions which give rise to a strong belief that there was some kind of an understanding between these two parties that the sale to Oastleman should be made to enure ultimately to the benefit of the wife. Oastleman speaks of the property frequently as a gift, and refers to his wife in that connection, and Carroll obviously was of the opinion that he was benefiting his daughter. Oastleman says that these references by him to the sale as a gift, was by reason of the fact that Oarroll had sold him the plantation below the actual value on which he placed an exaggerated estimate, and that his relations were such with his wife’s father that he had to humor him and deal with him in a way which he admits was not up to an exact standard of right. He says he was a very obstinate and peculiar man, and he had to act accordingly. Counsel of opposing heirs charge Oastleman with duplicity and double dealing in this matter; they say he for years lulled D. R. Oarroll into the belief that he was in good faith holding the property for his wife, protected by a recorded claim, while in point of fact he was attempt- *969 lug to hold it exclusively for his own benefit, but at the same time they take the position that the act of sale was a disguised ■donation from the father to the daughter. Oastleman testifies that the receipts given by Carroll were true; that he actually paid the four notes referred to therein, and he is corroborated to some extent by his brother as to certain payments made by him upon the purchase price of Coosa. He says that he was under the impression that notwithstanding the payment of the price itself, the notes would still be ■outstanding and susceptible of being legally used as collateral for his ■debts; that Thomas, as well as himself, was of that opinion, and that when D. R. Carroll offered to make endorsements upon the notes of partial payments as made, he, Castleman, objected, stating to him that by such endorsements the notes could no longer be used for that purpose; that he obtained those notes from Carroll for that express purpose, leaving the payments of the price to be evidenced toy receipts. It- might be conceded that if Castleman, instead of toeing a son-in-law of D. R. Carroll had been his son and presumtive heir, and a claim were being made against him as an heir for collation, a strong case would have been presented in support of that ■claim, but the claim for collation is directed not against Castleman, but against his wife, for and on account of transactions between him and her father. From that standpoint matters assume a very different shape.
There is no evidence going to show that Mrs. Castleman was either directly or indirectly a party to the sale or act in question, or that she consented to accept the property at all, still less with obligation to collate in any way for the same. On the contrary, ■there is evidence that she positively declined to do so. Certainly neither her father nor her husband, nor both together could force her •by any. agreement between themselves to assume obligations to which she gave no consent! During the period that the property stood in the name of ■ her husband upon the public records, it was subject to become, as in fact it did become liable for the payment of her. husband’s debts, with no power of protection on her part against such a result. Her own father, after the sale in question, took a special mortgage on the property to secure a debt of ten thousand - dollars due him by the husband, and Thomas, to whom it was afterwards transferred,- recevied out of the price of the sale made by him to Hudnall and Mrs. E. Castle- *970 man four thousand dollars wherewith to pay a debt unquestionably not that of the wife, but of Thomns W. Castleman. Prior to this, Thomas had received additionally six thousand dollars, arising from moneys paid on insurance policies covering buildings and cotton on the property which had been destroyed by fire, which amount was also applied by him to the payment of debts due him by the husband. Assuming as a fact, that the husband did deceive the father, and that there was a secret understanding between D. R. Carroll and Castleman, that the sale was a simulation, and that the real character of the act was an intended donation to the daughter, the penalty for this deceit could not be visited upon the daughter, who was not a privy to it.
We are not prepared to say that the sale was a simulation or a disguised donation to his daughter, though I). R. Carroll, may have intended that it should enure indirectly to some extent to her benefit. We are inclined to think that the sale to Castleman was a real sale, .but one made at a low price to him. There was no necessity for disguise in this transaction. D. R. Carroll was a man of large wealth; there existed no reason why he should not have made a donation to his daughter of the full value of the place entirely freed from collation, if he thought proper so to do. There is no claim or pretence that the rights of forced heirs have been interfered with. The question is one of simply ordinary collation. Carroll had a legap right to give the property to the daughter; she had the'legal right to receive it.
There is, therefore, no ground for applying in this case any question of donations in favor of a person incapable of receiving through dispositions, whether disguised under the form of an onerous contract, or in the name of persons interposed. The case calls for no presumption that the son-in-law is an interposed person. Were he such a person, the act, under Art. 1491, C. C., would be a nullity, not one giving rise to collation against the wife, no party to it. Neither is there any ground for the application of the provisions of Art. 1248, C. C., which declares that “the advantage which a father bestows upon his son, though in any other manner than by donation or legacy, is likewise subject to collation. Thus, when a father has sold a thing to his son at a very low price, or has paid for him the price of some purchase, or has spent money to improve his son’s estate, all that is subject to collation.”
*971 That article, in the absence of any question of interposition, does not extend to a sale made between a man and his son-in-law.
Though we have no article in the Louisiana Code corresponding to Art. 849, O. N., which is to the effect that:
“Les dons et legs faits au conjoint d’un époux suecessible, sont réputés faits avec dispense du rapport.
“Si les dons et legs sont faits conjointement á deux époux, dont l’un soulement est suecessible, celui-ci en rapporte la moitie, si les dons sont faits a l’epoux suecessible, il les rapporte en entier,’-’ we know of no text of the law making a wife liable to collation indirectly for gifts or donations to her husband. Succession of Landry, 25 An. 183; Ardis vs. Theus, 47 An. 1437. We do not here refer to cases in which the rules of interposition would be properly applied. There being no reason for applying those rules here, the particular form in which Carroll manifested his intention or desire to-benefit his daughter, if such he had, would tend rather to show that he desired to so shape matters as to exempt her legally from collation, than that he was seeking 'through improper methods to bring about a similar result. It is a significant fact that nowhere in the books or papers of the father is to be found any charge against the daughter.
In France the decisions generally ascribe resort to an act in the form of an onerous contract, as evidencing an intention to exempt from collation the party benefited by the act. Thus we find in Dalloz & Vergé under Art. 843, C. N., the following:
No. 85. “ Suivant une opinion le seul fait de déguiser la donation emporte dispense de rapport.” Grenoble, 6 Juillet, 1821; J. G. Success, 1120; Lyon, 22 Juin, 1825; Ibid et Dispos entre vifs, 4619;, Agen, 4 Mai, 1830; Ibid et Dispos entre vifs, 614; Caen, 26 Mars,. 1833; J. G. Success, 1120; Reg, 9 Mars, 1837; Ibid, et Dispos entre vifs 1633; V. autor en ce sens J. G. Succ. 1120.
No. 87. “ II en est spécialement ainsi de la libéralité déguisée sous: la forme, soit d’une vente d’immeubles.” Rennes, 10 Fevrier, 1818; J. G. Succ. 1120; 1 Toulouse, 7 Juillet, 1829; Ibid, Bordeaux, 20 Juillet, 1289. Ibid.
No. 97. “Lorsquela donation est déguisée la dispense de rapport. n’a pas besoin d’étre exprimée dans.les formes de 1’Art. 919; elle peut résulter de toute manifestation quelconque.” Req. 9 Mars, 1837, J. G. Success, 1122, et Dispos entre vifs, 1633.
*972 Opponents claim, however, that Mrs. Castleman ultimately derived benefit from the sale of the Coosa plantation; they say she ultimately received from the price of the last sale thereof the money with which certain property which they say stands in her name in New Orleans, was purchased. That by accepting that money she made herself privy to the antecedent acts between her father and her husband looking to conferring upon her a benefit through the sale of the Coosa plantation. There is no necessity of examining into what the legal situation would be were such the case. We find no evidence in the record to establish the fact itself.
We think the judgment of the District Court condemning Mrs. T. W. Castleman to collate twelve thousand five hundred and fifty - five ■dollars and sixty-three cents for. the Coosa plantation is erroneous. We think the various heirs should pay legal interest upon all sums received by them prior to the death of D. R. Carroll, and for which they are held to collate from the date of his death, and that the different heirs should also pay legal interest on all amounts received by them since the death of D. R. Carroll from the dates upon which the amounts were respectively received. We see no reason for passing at present upon the rights and interests of parties in the judgment obtained by D. R. Carroll against Thomas W. Castleman; that matter is left open for future adjudication and action. We see no ground for holding Mrs. Castleman liable to collation for one thousand dollars as prayed for in the motion of appellees to amend the judgment. That claim seems to have originated in this court; we find no allusion to it in the pleadings in the District Court, and no argument touching it was made in this court. We do not know upon what it was based, possibly it was upon the amount which formed the basis of the judgment of separation of property between Castleman and his wife, but we do not feel at liberty to deal with that •question as matters stand.
For the reasons herein assigned, it is ordered, adjudged and decreed that the judgment of the District Court, in so far as it “adjudges and decrees that the demands of the several heirs as against Mrs. Anna Castleman for the value of property received by her durngthe lifetime of her fathei D. R. Carroll, in addition to the amount •of two hundred and fifty dollars hereinbefore fixed, be recognized as due,” and as it “ ordered and decreed that the said Mrs. Anna Castleman do collate by taking less in the further sum of twelve thous- *973 and five hundred and fifty-five dollars and sixty-three cents, together with the costs of this court caused by this demand ” be and the same is hereby annulled, avoided and reversed.
. It is further ordered, adjudged and decreed that the different heirs in the successions of D. R. Carroll and wife be and they are hereby decreed to owe legal interest upon the various amounts which they received prior to the death of D. R. Oarroll, and for which they have been held to collate from the date of the death of the said D. R. Carroll; and legal interest upon the amounts which they have received since the death of D. R. Carroll, from the dates of the respective receipts of said amounts.
It is further ordered, adjudged and decreed that the right of the heirs to claim from Mrs. Anna Castleman, by way of collation, the amount of one thousand dollars, which they set up in their motion to amend the judgment appealed from, be and the same is received and left open for future examination, as are also the rights of all parties in and to and in respect to the judgment obtained by D. R. Carroll against Thomas W. Castleman.
It is further ordered, adjudged and decreed that the judgment appealed from, except in so far as the same is herein annulled, avoided and reversed and herein amended, be and the same is hereby affirmed. Appellees to pay costs of appeal. Costs in court below to abide the final decision in the cause.