(34 South. 731.)

No. 14,174.

## Succession of WEBER.*

(Dec. 2, 1901.)

APPEAL—INSUFFICIENT BOND—AMENDMENT—COLLATION BY HEIR.

### On Motion to Dismiss the Appeal.

1. Error committed by appellant which resulted in his not furnishing a proper bond of appeal will not prevent him from completing his appeal within legal delays. Dugas v. Truxillo, 15 La. Ann. 116; Smith v. Vanhille, 11 La. 382; Johnson v. Clark and Meader, 29 La. Ann. 763.

2. The act should be unequivocal, to authorize a presumption of abandonment. An oversight in drafting the bond, as relates to its amount, will not prevent timely amendment by another executed within time required. Leggett v. Peet, 1 La. 296; Yale v. Howard, 24 La. Ann. 458.

### On the Merits.

3. An heir must collate whatever he has received in excess of his share, unless same has been given as an extra portion. The intention to give as an extra portion must be indicated in an unequivocal manner, and will not be presumed from the fact that the donation was made under the guise of a contract of sale.

4. Where property and money are to be collated, rents and interest are due only from the date of the opening of the succession by the death of the ancestor. If the rental value of the property has been increased by improvements, the rents of the improved property are not to be collated, but only the rental value of the property in the condition in which it was at the date of the donation. Amounts expended in taxes, insurance, and maintenance are chargeable to revenues, and are not to be deducted from the value of the property to be collated.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Thomas C. W. Ellis, Judge.

In the matter of the succession of Odelia Zies Weber, widow of Jacob Weber. Action by Louisa Casserly against Teresa Seitz and others. Judgment for defendants, and plaintiff appeals. Reversed.

William S. Benedict and George Montgomery, for appellant. Edwin N. Whittemore and Robert Legier, for appellees.

### On the Motion to Dismiss.

BREAUX, J. The facts are, as relates to the appeal, that on July 3, 1901, the appel-

*Rehearing denied June 26, 1903.

lant filed a petition for an appeal, and obtained an order of appeal from the judgment rendered. The order fixed the amount of the bond at $500. The appellant instead of executing a bond for that amount, executed an appeal bond on July 3, 1901, for $250—one-half less than required—and on the same day caused a citation of appeal to be served on the appellees. Seeking to correct that which was evidently an oversight, on the 8th day of July, 1901, still within the 10 days, appellant filed a petition, and obtained a second order of appeal from the judgment. This order refixed the amount of the appeal bond at $500. On the same day (that is, on the 8th day of July) the appellant gave bond in the sum of $500, and immediately caused citation to be served on the appellees.

The appellees move to dismiss the appeal on the ground, in substance, that two appeals have been taken from the same judgment, and that it is impossible for two appeals by the same parties from the same judgment legally to exist at the same time; that although the bond of $250, being for a sum less than that ordered by the court, was inadequate to support the first appeal, yet the appellant was bound by the first appeal, as she had had the appellees cited to answer the appeal, and that, as to the second appeal, the appellant was without right to obtain it, and the court without authority to grant it, because the appellant was without right to withdraw the first appeal. In our view, appellant, having failed to furnish a legal bond, although citation had been served, had not thereby lost the right of appeal if in time to file the record on the return day. The appeal was not such as the court could sustain. It was defective on the face of the bond.

Appellant did not choose to wait for a dismissal on appellee's motion to dismiss, but acted within the 10 days, executed another bond, caused citation to issue, and completed an appeal before the return day.

Had she chosen to wait for the court's action in case appellee had filed a motion to dismiss, she would have been in time to take another appeal, if the delay to file the record had not elapsed. In Dugas v. Truxillo, 15 La. Ann. 116, the court held that an appeal dismissed on motion of appellee cannot be considered as an abandonment of the appeal by the appellant; that the second appeal, having been taken within the year, is valid, under the authority of Smith v. Vanhille, 11 La. 382.

The appeal is now before us, and practically it would serve no purpose if it were dismissed. The appellant would be, under the ruling of this court, entitled to a devolutive appeal. Johnson v. Clarke & Meader, 29 La. Ann. 763. The theory of appellees for the dismissal is that the appellant has abandoned her appeal. This is not evident, for the act should be unequivocal to authorize a presumption of abandonment. Leggett v. Peet, 1 La. 296; Yale v. Howard, 24 La. Ann. 458; Lawson v. Ripley, 17 La. 238.

The second order of appeal was a copy of the first. It may be considered as the original order repeated. The appellant complied with the order issued. In the error committed in the first instance, we do not find that there was abandonment or the least intention to surrender the right of appeal. It is true that one may technically waive an appeal, although he did not mean to waive it, yet in this case we do not think that there was even a technical waiver.

*The motion to dismiss is denied.*

### On the Merits.

#### (May 25, 1903.)

PROVOSTY, J. This suit is for partition and collation. The plaintiff, Mrs. Louisa Casserly, and the principal defendant, Mrs. Teresa Seitz, are the children and sole heirs of their mother, Mrs. Odelia Weber, deceased. The two other defendants, Jacob Seitz and Louisa Pratz, are the children of the defendant Mrs. Seitz. They are made defendants because the one received a donation from the deceased, and the other received a donation from the principal defendant, Mrs. Seitz, and it is claimed that the properties thus given should be collated. The demand must be dismissed at once—in the one case, because nothing shows that the donee was a person interposed to receive the donation for the principal defendant, and because the donation does not exceed the disposable portion, the value of the property being only $1,200; and, in the other case, because, if the collation is ordered, the property transferred can be brought back to the mass fictively, notwithstanding the

transfer, and there is no question that the defendant Mrs. Seitz has ample property to satisfy any judgment that may be rendered against her in this suit.

Defendant Mrs. Seitz not only denies that she owes collation, but says that it is her sister who owes it. She alleges that for 12 years she acted as housekeeper and general nurse to her mother, who was an invalid, and that these services were worth $40 a month, or a total of $5,040; that for the 18 months immediately preceding the death of her mother she attended her continuously day and night, and that these services were worth $60 a month, or a total of $1,080; and she prays for judgment against the succession for the value of said services. She gives a list of properties and sums of money which she says her sister received from her mother, and prays that they be collated. Finally she sets forth the expenses incurred and taxes and insurance paid by her on the properties she is asked to collate, and she prays that these expenses, etc., be allowed her, in case she is required to collate the properties.

The theory of each of the litigants seems to be that the other has never acquired anything otherwise than by gift from the mother. Each points to the present holdings of the other, and claims that they come from the mother. On this theory the case has been tried. In the record of 700-odd pages, the financial history of each of the litigants has been minutely traced from beginning to end, through a period of some 28 years. This has been done by means of the testimony of the parties themselves, of friends, neighbors, contractors, and persons generally with whom the parties had dealings during this period; by the records of cases in the courts, and by the records of the conveyance and mortgage and tax collector's offices; by accounts of all descriptions; by statements from insurance companies; by tabulated statements of rents actually or probably received; by expert testimony of values, etc. To read intelligently the testimony, and know the relevancy of each piece of evidence, it has been necessary for the court so to familiarize itself with some 25 pieces of real estate as to know them when referred to or described either by the plats of the original surveyors, or by old municipal numbers, or by number of the square in which situated, or by the boundaries of the squares, or by the date of the act when transferred, or by the name of the notary before whom transferred, or by some prominent event connected with the piece of property, or finally by the new municipal number. Add to this that most of the streets have changed names. Confronted by this mountain of work, the court felt sorely tempted to send the whole chaos back to the lower court, to be there brought into some order. In his reasons for judgment, the learned judge a quo dealt with the case only in its general aspects. It was not possible to judge of the correctness of his conclusions without first mastering all the details. Counsel, in the limited time allowed for oral argument, had necessarily to deal in generalities. In their brief of 115 pages, the counsel for plaintiff have spared no pains in the endeavor to facilitate the labors of the court, and their work has been of very great assistance; but, at home themselves in the labyrinth of the case, they did not suspect how bewildering to a stranger the approaches thereof would be, and so they failed to give much information necessary for intelligently following them through the mazes of the controversy. They left the court to dig out of the transcript bits of information on numberless points in regard to which, familiar as they themselves were with them, they did not suspect the need of the court. All this, however, is said more by way of explanation of the delay of the court in deciding the case, than as necessary for the decision of the case.

Jacob Weber, the father of the two principal litigants, died in 1874, leaving three children, namely, the litigants and their brother, Jacob V. Weber. The succession was settled amicably by the parties. The mother kept three pieces of property, and gave two to each of the children. Jacob V. Weber, the brother, died six years afterwards, in 1880, leaving his mother and two sisters as his sole heirs. The mother kept the property of his estate until her death, with the consent of her two daughters. As to all these matters there is between the two litigants perfect equality and no dispute.

For a satisfactory treatment of the case,

there is but one mode of proceeding—to take up separately each piece of property in dispute, and decide, as far as the record will permit, whether or not it is subject to collation. But it may be well to premise some information as to the mother and her means, and as to the personal history of the litigants themselves. At the death of her husband, who was a blacksmith and wheelwright, Mrs. Weber, so far as the record shows was possessed of no means other than of the three properties already mentioned. In one of them she lived and kept a small grocery store, of which the average stock, it seems, did not exceed $50. It was a double cottage. She inhabited one side, and rented the other. She rented, also, the two other houses. The houses were small affairs, bringing $14 and $8 and $10, respectively. To equalize matters in the settlement of the succession, the children gave her their notes—Mrs. Casserly, for $200; Jacob, the brother, for $100; and Mrs. Seitz, for $65. This was in 1874. At that time Jacob V. Weber and Mrs. Casserly were already married, and Mrs. Seitz was yet unmarried, living with her mother. From the death of the brother, in 1880, the mother collected the rents from his two houses, amounting to $19 a month. She was extremely thrifty and economical, and, it would seem, a good business woman. What her accumulations or acquisitions had been up to 1880, or in fact were afterwards, the record does not show, except inferentially from the gifts she was able to make to her daughters. That she was a kind and indulgent parent, as much attached to the one daughter as to the other, the record leaves no doubt. She died in 1899. About 18 years before her death she had a fall, and dislocated her hip. After a few months, however, she could move about and attend to her business. About 18 months before her death another accident befell her, which deprived her permanently of the use of her limbs, reducing her to the state of a helpless invalid.

Her daughter Louisa (Mrs. Casserly) was married a first time in 1868 to one Peter Gleber. She separated from him after a short time—how long afterwards, the record does not specify—and returned to her parents. She obtained a divorce in 1875, and on the 13th of May of that year was married to her present husband. She does not pretend that

either of her husbands contributed towards her enrichment, except that the second defrayed the household expenses. He was, however, a man of some means, and may still be. She, like her sister, inherited or learned from the mother economy and thrift. With her, as with her sister, and as it was with the mother, to save and accumulate, and invest in real estate, seems to have been a dominant idea. For three and a half years, she says (other witnesses say for about two years), she kept in one of the rooms of her house a small notions store, which she says was very profitable. Exactly when this was, the record does not show, but it was between 1875 and 1880. In 1876 she bought out, for $150, the contents of a furnished house, and sold the furniture at retail at great profit— she says $500, and the record bears her out, in that her profits were very large. For about one year—exactly when, the record does not show—she had her mother's grocery store. She gave up the notions store, she says, because of discouragement caused by the death of three of her children in the space of four months, and gave up the grocery, she says, because she found the work of attending to it too onerous in her condition; she being on the point of becoming a mother. Her sister says she gave it up because of a bill she could not pay. She has but one child, issue of her second marriage.

The defendant Mrs. Seitz was married in 1873. She stayed at her mother-in-law's three months; and then about one year, rent free, in a house of her father's; then, until August 28, 1882, she lived with her husband in one of the houses inherited by her from her father. At that date she abandoned her husband, and with her three children, aged eight, five, and three, went to her mother's, and there she lived until the death of the mother, in 1899. A few months after this removal to her mother's her fourth child was born. Four years afterwards, on March 8, 1886, she obtained a divorce on the ground of want of support and cruel treatment. The husband was a laborer, and seems to have been a good for nothing fellow, addicted to drink, who did nothing towards supporting her.

We now proceed to take up the different items in dispute, and decide, as best we can from the record, whether they are subject or not to collation.

Beginning with Mrs. Seitz.

1357–1359 St. Anthony, acquired 5th of April, 1886, by act of sale from her mother, at recited price of $500:

Mrs. Seitz says that this was not a donation, but that the property had been bought by her in her mother's name, and that this act of sale to her was merely to set the title right. The sale to the mother was on the 27th of May, 1885, and was for $600. Being asked where this money came from, if she furnished it, Mrs. Seitz answers that she had previously bought a piece of property for $300, and had sold it to one Spitsfaden for $350. She cannot tell from whom or when she bought this other piece of property. Being pressed as to when she bought it, she answers, she cannot tell; "About nine years ago." When informed that this would place the purchase in 1892, she answers, "Yes; about that;" losing sight of the fact that this would place the purchase of the first property six years after that of the second. She produces neither the act by which she purchased the property, nor that by which she sold it, both of which, as a matter of course, were of record, if the transactions in question really took place. She says the property was at the corner of St. Anthony and Urquhart, and that she kept it three years, and sold it to Spitsfaden, and straightway bought the other property in the name of her mother for $600. Now, it is noteworthy that about that time (that is, on the 23d of March, 1885) there was a piece of property sold to Spitzfaden at the corner of St. Anthony and Urquhart; but it was sold to Mrs. Spitsfaden, and was sold by Mrs. Weber, not by Mrs. Seitz, and the price was $375, not $350. Being asked whether the property sold to Spitsfaden had been acquired in her own name, or in that of her mother, she answers, in her own name, and that she thinks her husband signed the act. She thinks she was living with her mother (that is, had already separated from her husband) when she bought the property, and she thinks her husband signed the act. Being asked why she bought the second piece of property in her mother's name, she says it was for fear of her husband; and, when asked whether she had not the same fear when she bought the first, she answers: "I don't know." Being asked from whom she acquired the property in the name of her mother, she answers: "I couldn't say. They were French people." She cannot tell whether she acquired the first property before or after her acquisition of her tax-sale property, which was in August, 1889, three years and some months after the alleged acquisition in her mother's name. When asked where she got the $300 with which to make the first purchase, she says she saved it from her rents— a thing utterly improbable, since it is hardly possible that she could have saved any of her rents. The acquisition in the mother's name was in April, 1886. Three years before that would be April, 1883. Now, in August, 1882, seven months previously, she had taken refuge in her mother's house with her three children, and shortly to give birth to a fourth. Up to that time she had been living with her penniless and shiftless husband, who had been doing nothing towards supporting her, and her gross income, according to her own statement, had been $12 per month, derived from renting one-half of the house she was living in, and one other little house inherited from her father. According to Mrs. Casserly, her income had been only $9. Out of this $9 or $12 a month she had had to pay taxes, insurance, etc.

When she informed her mother of her intention to leave her husband, the mother's response was, "You are going to stay with me, for as long as I have a piece of bread to eat you can have it with your children." This language speaks volumes as to her financial condition. After she had come to live with her mother, her revenue must have been increased by the rent of the house which she had been occupying, $5 a month, and she had no expense of board; but she still had to clothe and otherwise provide for herself and her four children, and pay taxes, insurance, etc.; and besides out of a gross income of, say, $17 a month, she could not in seven months put aside $300. On March 8, 1886, nine months after the alleged purchase in the name of her mother, we find her mother paying the costs of court and the fees of the attorney for obtaining the divorce for her. We gather from the foregoing facts that, when Mrs. Seitz came to live with her mother, it was more a question of bread with her, than of investing in real estate; and we think that a man, and still

less a woman, hardly forgets the name of the person from whom he makes his first acquisition of real estate; and our conclusion is that this act of April 5, 1886, was a donation, and that the property, or the value thereof—it having been sold—must be collated.

For the purposes of the collation, we value this property at the price at which it was sold to Scharfenstein, $700. Out of this must be deducted $40, cost of new roof.

In the case of Clark v. Hedden (La.) 33 South. 116, this court held, affirming former decisions, that "an heir must collate whatever he has received in excess of his share, unless same has been given as an extra portion. The intention to give as an extra portion must be indicated in an unequivocal manner, and will not be presumed from the fact that the donation was made under the guise of a contract of sale." A rehearing was granted in the case, but not on this point.

1417–1425 St. Anthony, acquired by act of sale from mother, November 30, 1887, at recited price of $500:

Mrs. Seitz admits that this was a donation. The property must therefore be collated.

For the purposes of the collation, we value the property at $800, from which must be deducted expense of new roof and closet, $55.

1416–1418 St. Anthony, acquired May 30, 1888, by act of sale from the mother, at a recited price of $225:

Mrs. Seitz admits that this was a donation. The property must therefore be collated. For the purposes of the collation, we value it at $1,600. From this must be deducted $1,392, the cost of a new house.

Lot 17, square 770, Bourbon (Bagatelle), St. Anthony, Prosper, and Solidelle (Roman) streets, acquired at tax sale August 14, 1889: We find no reason for holding that this property is subject to collation.

1869 Roman street, acquired December 7, 1889, by purchase, for $350; act before Paul A. Canant, notary public:

We find no reason for holding that this property is subject to collation.

1861–1863, 1865–1867, Roman street, acquired July 17, 1890, by act of purchase from mother, at recited price of $500:

Mrs. Seitz testifies that she paid her mother

$350, and that her mother let her off of $150, at the same time liberating Mrs. Casserly from a like debt of $150. Mrs. Casserly denies positively that she owed her mother this $150. She says she knew nothing of this transfer to Mrs. Seitz until long afterwards. We doubt very much that this transaction was not a donation. However, we have concluded that the preponderance of the evidence was in favor of the recitals of the act, and we will let it stand, although it is very strange that defendant's witness Hall, one of the witnesses to the act, was not questioned relative thereto. The $150 admitted to have been given must, however, be collated.

1401–1403, 1405–1407 St. Anthony and 1813–1815 Villere, acquired by act of sale from mother May 16, 1891, at recited price of $1,500 cash:

Mrs. Seitz admits that she did not pay this $1,500, but she says the sale was subject to the condition that her mother should receive the rents of the house until the $1,500 was paid, which would be in 1897, and the mother did get these rents, and the house was paid for in that way. This story contradicts the act, and finds support nowhere, and is inherently improbable. We do not believe it.

We will say here, touching the testimony of Mrs. Seitz, and the allegations of her reconventional demand, that the same seem to have been dictated more by the necessities of her case than by a desire to speak the truth, the whole truth, and nothing but the truth. Counsel for plaintiff are in great measure justified in their statement that she is contradicted either by herself or by her own witnesses or by documents 43 times, that her memory fails her on important matters 36 times, and that she is mistaken or uncertain 23 times. This property, also, must therefore be collated. For the purposes of the collation, we value it at $3,500. From this must be deducted the cost of the house, etc., $1,095.

1422 St. Anthony, acquired September 28, 1896, by purchase from Widow Theodore for $700: We find no reason for holding property was not paid for by Mrs. Seitz herself. The property is therefore held to be exempt from collation.

1433–1435, 1385–1387 (old No. 127) St. Anthony, and 1814 Villere, acquired by donation

from mother, by act before Duvignaud, notary public, August 20, 1897, at a valuation of $1,950:

This property is subject to collation, it not having been given as an extra portion. For the purposes of the collation, we value it at $3,300. From this must be deducted the cost of useful improvements, $267.

The grocery, appraised at $50, is also subject to collation.

We now proceed to consider what properties or sums of money, if any, must be collated by Mrs. Casserly.

$600:

Mrs. Seitz says that at the same time that her mother made to her the donation in the form of a sale, of November 30, 1887, she gave Mrs. Casserly $600, by releasing her from a debt of like amount. This doubtless has reference to a donation of $600 made to Mrs. Casserly by the mother on the 9th of the same month by act before Dreyfous, notary public. This act recites, however, that the donation is made as an extra portion, "and the donee shall not have to collate any portion thereof." Therefore collation is not due for this $600.

$250:

Mrs. Seitz says that at the time the property 1416–1418 St. Anthony was given to her, namely, May 30, 1888, this $250 was given to her sister. Mrs. Casserly denies positively that she got the $250. Mrs. Seitz holds the affirmative, and carried the burden of proof. She has not discharged it, and therefore collation is not due for this $250.

$150:

Mrs. Seitz says that at the time of the sale to her of the property 1861, 1863, 1865, 1867 Roman, July 17, 1890, her mother gave this amount to Mrs. Casserly, or, rather, released Mrs. Casserly from a debt for like amount: Mrs. Casserly denies that she got this amount; and therefore we repeat as to this item what was said of the item $250, next above.

$300:

While in the reconventional demand this item is asked to be collated, Mrs. Seitz admits on the stand that she received a like amount at the same time; and the same thing may be said of the items of $1,200 and $225. These items offset each other.

$250:

In one part of her testimony, Mrs. Seitz, in enumerating the several amounts received by Mrs. Casserly, gives only the one $250 mentioned above. In another part of her testimony, and in her reconventional demand, she says that Mrs. Casserly received $250 twice. She does not undertake to say when or under what circumstances the second $250 was received. Mrs. Casserly denies positively that she received $250 at any time. Collation is not due for the amount.

$500:

This item is set down in the reconventional demand, but no evidence is offered in support of it, and therefore it has not to be collated.

$1,000:

The story of this $1,000 is this: The mother had let Mr. Casserly have $600 at one time, and $250 at another. Mrs. Casserly had let him have $150. When Mrs. Casserly found out that her husband had got this $850, she insisted that he give it to her. He at first demurred, but finally consented, and gave her a mortgage for the $1,000, and later he paid the mortgage debt. Mrs. Casserly says that her husband insisted that the mother had given him the money, but we think, all things considered, that the $850 must be treated as having been given by the mother to Mrs. Casserly, and as such to be subject to collation.

Of the $2,500 item there is not one iota of proof, and therefore no collation is due of it.

Lot 2 in square bounded by St. Anthony, Derbigny (late Prosper), Roman (late Solidelle), and Bagatelle streets, acquired by purchase from Langhauser August 7, 1889, for $132:

In her reconventional demand, Mrs. Seitz says that this $132 was furnished by the mother, but no evidence is offered in support of this assertion. Mrs. Casserly, on the other hand, explains in great detail how she managed to pay the $132, and in her statement she is corroborated by the man who sold the property to her. This property, therefore, is not subject to collation.

2212–2214 Bourbon, acquired by purchase from Widow Alcindor and others on October 1 and 17, 1891, for $400:

Again, as to this property, Mrs. Seitz makes allegations she does not undertake to substantiate, while Mrs. Casserly produces her vendor to corroborate her statements,

which are detailed and uncontradicted. Here, again, collation is not due.

2035--2043 Bourbon and 1912 Villere, acquired by act of donation from mother August 9, 1894, at estimation of $2,000:

This act recites that the donation is made by way of extra portion, and is not to be collated. But Mrs. Casserly denies that it was a donation at all. She insists that the property was purchased by herself with her own money, and that she put it in the name of her mother in order that it might not fall into the community of acquets and gains that existed between her husband and herself. In this statement she is not contradicted, except by the act. On the other hand, she produces in corroboration of what she says a counter letter duly executed by her mother; and she produces also the notary who passed the act, Mr. F. J. Dreyfous, who corroborates her in every particular. Needless to say, this counter letter and testimony are conclusive. Mrs. Casserly explains that she got $400 of the $1,000 by the sale of the property referred to above as having been bought from Langhauser on August 7, 1889, and got the remainder by the accumulations of her rents. She produces her bankbook, showing that between July, 1892, and July, 1893, she deposited in bank $3,745.34. She built on the two lots two houses, and raised a third, at a cost of $2,710, but she explains where she got the money. She produces her bankbook, showing that she had at the time she contracted for the houses $1,000 in bank, from the sale of one of her other properties. She produces the check by which the $1,000 was paid to her. She produces as witnesses a Mrs. Hawk, who testifies to lending her $700 at one time, and $150 at another time, and $50 still at another time, towards paying for one of these houses; and one of the witnesses of defendant, a Mrs. Dubois, testifies to lending her $225 towards building the other house. Towards completing the payment for this same house she borrowed, she says, $85 from her mother, and we find the sum of $85 receipted for by the contractor as a last payment on the house. The statements of all these witnesses cover a good many details, and all corroborate Mrs. Casserly. We conclude that the property is not subject to collation.

Lot, with improvements, in square bound-ed by Villere, Union, Bagatelle, and Urquhart, acquired at tax sale on March 30, 1896, for $41.24 cash:

Mrs. Seitz says her mother furnished the money to pay for this. The statement is contradicted by Mrs. Casserly, and is improbable in itself, since on the day of that sale Mrs. Casserly had ample funds in bank to pay for this property.

1430--1432 St. Anthony, acquired by act of sale from mother on August 20, 1897, at the recited price of $1,400:

Mrs. Casserly produces a counter letter showing that this property had been put by her in her mother's name, and she testifies that the transaction was not a donation, but merely a rectification of title; and Mr. Dreyfous, the notary who passed the acts and drafted the counter letter, corroborates her. This property is not subject to collation.

1434--1436, 1438--1440 St. Anthony, acquired by donation from mother on August 20, 1897, at valuation of $1,800:

Mrs. Casserly admits that this was a donation. It must thereupon be collateral. For the purposes of the collation, we adopt the valuation placed upon this property in the inventory, $2,000. Mrs. Seitz values it at $2,500, but we have found her testimony to be unreliable. Her witness Demarest values it at $2,400, but he admits that he does not know how the two houses are finished inside, as he has never been in them; and it seems that they are not plastered, but are papered on planks. Mrs. Casserly says that the property originally cost her mother $1,995, and that this was years ago.

We understand there is no contest of the will, and that each of the parties takes the properties specially donated to her therein.

On the several amounts they must collate, the parties owe legal interest from the opening of the succession by the death of the mother. The parties owe rents from the same date on the properties they must collate. On the properties on which new houses have been built, the rent is to be chargeable according to the rental value of the property in the condition in which it was at the date of the donation. Taxes and insurance and maintenance are chargeable to revenues, and are not to be deducted. Carroll v. Succession of Carroll, 48 La. Ann. 956, 20 South. 210.

We disallow the reconventional demand

for services. Mrs. Seitz was under special obligation to her mother, who had housed and fed her and her four children for so many years; and, besides, while the evidence is not sufficient to enter into a nice computation of the revenues of the mother and of those of Mrs. Seitz, yet the result eloquently proclaims that Mrs. Seitz ought to be satisfied with what she has received. Going to live at her mother's in 1883 with four small children to clothe, feed, and educate, with no resources except the rents of two small houses—say, $14 to $17 per month gross—and her labor, she finds herself in 1899 with fourteen pieces of improved real estate, valued·at $13,100; and this not by speculation, but by simple increment. Add to this that the children have been educated and settled in life, and that the son has received a property valued at $1,200. That she and her children should have helped in the household work while they were free pensioners in the house was nothing but natural. That the burden of the care of the stricken old mother should have rested specially upon her was, again, but natural, under the circumstances. If she thought that her share of it was too great, the time to call upon Mrs. Casserly for contribution was then, not now. The record leaves no doubt it would have been willingly furnished. The demand was an afterthought engendered by the heat of the controversy over the settlement of the succession. It was not mentioned at the making of the inventory, when each was bringing forward all claims against the other. We do Mrs. Seitz the justice to believe that, but for this demand of her sister's for collation, she would never have thought of bringing a claim for the services rendered to the mother who welcomed her and her children within her doors with the words, "As long as I have a piece of bread to eat, you and your children shall share it."

How the account will come out between the sisters upon final settlement, we do not know. We have had to take the law and the facts as we have found them. We believe that, even after the collations which in this judgment she is condemned to make, Mrs. Seitz will still have had her full share of her mother's bounty; but, if so happens that she shall not, the fault is hers, in resorting to the indirect means of acts of sale for evidencing the donations of her mother, instead of leaving the mother to make plain and open donations, as Mrs. Casserly did, which might have been accompanied by dispensation from collation. The simulated sales she made in anticipation of the death of her mother tell heavily against·her. Her explanation , of them is based upon nothing except her ipse dixit. Possibly, and not probably, the mother's wish was that the gifts made by means of the acts of sale should not be collated. She certainly evinced always the desire that the two daughters share equally. But if, in making these gifts, she did not express unequivocally her wish that they should be considered as an extra portion, this court is helpless to eke out the situation.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that this case be remanded to be proceeded with according to law, and in accordance with the views herein expressed; that the plaintiff pay the costs of the demands against Louisa Pratts and Jacob Seitz, and that defendant pay the costs of appeal; and that the costs of the lower court be divided equally between the parties.