593 So.2d 1239 (1992)
SUCCESSION OF Charlie DOLL
v.
Paddy Ann DOLL.
Ludeweka Doll SULLIVAN
v.
Paddy Ann DOLL.
No. 91-C-1009.
Supreme Court of Louisiana.
January 17, 1992.
Rehearing Denied February 20, 1992.
*1242 Nathan T. Gisclair, Brian T. Leftwich, David W. O'Quinn, Montgomery, Barnett, Brown, Read, Hammond & Mintz, for applicant.
Byron A. Richie, Richie & Richie, for respondent.
COLE, Justice.
The issues in this collation action are, first, whether the fruits of an immovable collated in kind are themselves subject to actual collation; and second, if the fruits are subject to actual collation, whether such collation is due from the date of acquisition, the date of the donor's death, or from the date of judicial demand. A threshold question is whether mineral lease bonuses and the revenues derived from the sale of timber constitute "fruits" of an immovable within the meaning of Louisiana Civil Code article 551.

I.
The facts in these consolidated cases are undisputed. Four months before his death in 1978 Charlie Doll conveyed valuable acreage in Caddo Parish near Blanchard, La. ("the Blanchard property") to one of his three children, Dr. Paddy Ann Doll, for $60,000. Mr. Doll died on August 4, 1978, and Dr. Doll qualified as executrix of the succession. The Blanchard property generated rental income from the date of acquisition, and after Mr. Doll's death, Dr. Doll realized additional revenue from two timber sales and the execution of two mineral leases.
In 1982, during the pendency of the succession proceedings, Ludeweka Doll Sullivan, Charlie Doll's daughter, instituted suit against Dr. Doll, contending the transfer to Dr. Doll was a donation in disguise under Louisiana Civil Code article 2444[1] and demanding collation of the property, together with all fruits and revenues derived therefrom from the date of acquisition. Prior to trial, on December 19, 1985, Dr. Doll stipulated the conveyance of the property was a disguised donation and voluntarily surrendered the property to the succession,[2] and requested reimbursement of the purchase price and the expenses incurred in improvement and preservation of the property. Ultimately, the parties executed a compromise agreement, and in accordance therewith, an interlocutory consent judgment of May 24, 1987 was rendered recognizing Dr. Doll's right to reimbursement of $120,000 from the succession.[3] The parties further agreed the amount of revenues from 1978-1985 was $160,209.31, itemized as follows:

Rents $13,740.00
Sale of timber and pulpwood $73,269.85
Government subsidy for planting
trees $ 2,404.00
Bonus payment for mineral lease $70,795.46

The revenues were received during the following time periods:

Date of transfer to date of Mr. Doll's
death $ 188.33
Date of death to date of judicial demand $152,210.98
Date of judicial demand to collation
in kind $ 7,810.00[4]
*1243 Thus, the only issue unresolved was whether Dr. Doll was obligated to collate the income derived from the Blanchard property during the seven years it was titled in her name. In the alternative, Mrs. Sullivan alleged Dr. Doll breached her fiduciary duty as Executrix of the Succession of Charlie Doll by failing to initiate a claim of lesion against herself in connection with the Blanchard property in contravention of Louisiana Code of Civil Procedure articles 3191 and 3211.

II.
After trial on stipulated facts, deposition testimony, and documentary evidence, the trial court rendered judgment ordering Dr. Doll to collate the rental revenues, proceeds from timber sales, and mineral lease proceeds from the date of acquisition of the property.[5] The obligation to return $160,209.31 was offset by the previous interlocutory judgment. Consequently, a final judgment was rendered in favor of the Succession of Charlie Doll in the amount of $40,209.31 against Dr. Doll. Dr. Doll alone appealed.
The Court of Appeal affirmed the ruling of the trial court ordering the collation of the revenues to the succession but modified the judgment to reflect only fruits accruing post-death were subject to collation, i.e., $160,020.98.[6] The court of appeal expressly classified as fruits the rental revenues and proceeds derived from the sale of timber. However, the court found it unnecessary to classify the mineral lease payments, instead grounding Dr. Doll's obligation to return the payments on the donee's responsibility for diminution in the value of an immovable resulting from the imposition of the mineral lease, a real right. See La.Civ.Code Ann. art. 1264 (West 1987). But see Doll, 577 So.2d at 805 (Marvin, C.J., and Norris, J., concurring) (the bonus paid for an oil and gas lease is a civil fruit). Upon Dr. Doll's application, we granted certiorari.[7]
We now reverse the judgment of the Court of Appeal and order Dr. Doll to return to the Succession of Charlie Doll the fruits derived from the previously collated Blanchard property which have accrued since the date of judicial demand. While the immovable property is subject to collation, the fruits derived therefrom are not. Rather, the fruits must be restored from the date of judicial demand under the provisions of Louisiana Civil Code articles 1559(4) and 1569.

III.
At the outset, we encounter a question regarding the proper scope of our review. In brief to this Court, Mrs. Sullivan argues the court of appeal erred in characterizing revenue derived from the timber operations conducted on the Blanchard property as a "fruit" rather than as a component part of the land. Additionally, Mrs. Sullivan contends in her argument before this Court the mineral lease bonus is not a fruit because the execution of a mineral lease implies an alienation of the minerals. According to Mrs. Sullivan, the voluntary alienation of the timber and mineral rights by Dr. Doll rendered her liable for their value pursuant to Louisiana Civil Code article 1270,[8] and alternatively, article *1244 1260.[9] If we were to embrace Mrs. Sullivan's conclusions as our own, we would not reach the issue of collation of fruits with regard to the timber proceeds and mineral lease payments and would thereby affirm the judgment of the court of appeal on different grounds.
Dr. Doll insists the issue of the characterization of the timber revenue and mineral bonuses is not properly before the court and can not be considered as Mrs. Sullivan neither sought a writ on this rejected claim[10], answered or opposed Dr. Doll's writ application, or otherwise preserved the issue for review by this court. To support her argument, Dr. Doll refers this Court to Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971); Madison v. American Sugar Refining Co., 243 La. 408, 144 So.2d 377 (1962); Blades v. Southern Farm Bureau Cas. Ins. Co., 237 La. 1, 110 So.2d 116 (1959).
The cited jurisprudence is not persuasive. Jordan and Madison simply state where certiorari is granted on the application of one party to a suit, the judgment cannot be amended or changed to the benefit of the other parties who have failed to apply for review. Mrs. Sullivan, however, neither seeks reversal nor modification. To the contrary, the court of appeal judgment was favorable to her. Neither was Mrs. Sullivan compelled to answer. La.Code Civ. Proc.Ann. art. 2133 (West Supp.1991). See Diefenthal v. Longue Vue Management Corp., 561 So.2d 44 (La.1990). We recognize Blades suggests when a writ is granted to an opposing party, the party successful in obtaining the decree in the court of appeal cannot, even in support of such decree, re-urge in the Supreme Court grounds of decision rejected by the intermediate court, when this party has failed to apply also for certiorari. Jordan, 257 La. at 1001 n. 2, 245 So.2d at 153 n. 2 (citing Blades v. Southern Farm Bureau Cas. Ins. Co., supra). Blades, however, was drawn into question by the enactment of Louisiana Code of Civil Procedure article 2164 and the resultant abolition of the theory of the case doctrine. Under article 2164, the appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. Accordingly, the appellate court may affirm on grounds different from those relied upon by the lower court. See La.Code Civ.Proc.Ann. art. 2164 (West 1975).
Even assuming a vestige of Blades survived the enactment of article 2164, the case was legislatively overruled by the 1989 amendment to Louisiana Code of Civil Procedure article 2133 adding paragraph B. 1989 La.Acts, No. 121, § 1. A party who does not seek modification, revision, or reversal of a judgment in an appellate court, including the supreme court, may assert in support of the judgment any argument supported by the record, although he has not appealed, answered the appeal, or applied for supervisory writs. La.Code Civ. Proc.Ann. art. 2133B (West Supp.1991). Therefore, Mrs. Sullivan's contentions regarding Dr. Doll's accountability under Civil Code article 1270, or alternatively, article 1260, remain viable.

IV.
In the absence of rights of other persons, the owner of a thing acquires the ownership of its natural and civil fruits by right of accession. La.Civ.Code Ann. art. 483 (West 1980). Prior to the effective date of Article 551,[11] the jurisprudence, as well as doctrinal materials, indicated "fruits" was construed according to the context in which the issue of classification *1245 arose. See, e.g., Gueno v. Medlenka, 238 La. 1081, 117 So.2d 817 (1960) (usufruct); Milling v. Collector of Revenue, 220 La. 773, 57 So.2d 679 (1952) (taxation); Harang v. Bowie Lumber Co., 145 La. 96, 81 So. 769 (1919) (good faith possession); Elder v. Ellerbe, 135 La. 990, 66 So. 337 (1914) (good faith possession). See also A.N. Yiannopoulos, Personal Servitudes § 50, in 3 Louisiana Civil Law Treatise (3d ed. 1989); A.N. Yiannopoulos, Property § 42, in 2 Louisiana Civil Law Treatise (3d ed. 1991). Moreover, "products" was synonymous with fruits, leading the courts simply to differentiate fruits and non-fruits. Todd v. State, Dep't of Natural Resources, 474 So.2d 430, 434 n. 5 (La.1985). See Harang, supra; Elder, supra; La.Civ. Code art. 502 (1870); A.N. Yiannopoulos, Personal Servitudes § 50. Finally, a unitary notion of fruits ensued with the enactment of article 551. See Expose' des Motifs, Title III: Personal Servitudes, La.Civ. Code Ann. (West 1980); Doll, 577 So.2d at 805 and the authority cited therein. Subsequently, the Civil Code distinguished fruits from products. See La.Civ.Code Ann. art. 488 (West 1980); 1979 La.Acts No. 180, § 1 (effective Jan. 1, 1980).
The Civil Code defines products as having been derived from a thing as a result of diminution of its substance. La.Civ.Code Ann. art. 488. In contrast, La.Civ.Code Ann. art. 551 (West 1980) provides:
Fruits are things that are produced by or derived from another thing without diminution of its substance.
There are two kinds of fruits; natural fruits and civil fruits.
Natural fruits are products of the earth or of animals.
Civil fruits are revenues derived from a thing by operation of law or by reason of a juridical act, such as rentals, interest, and certain corporate distributions.
In brief, "product" connotes irreversible diminution whereas "fruit" suggests renewal.
Early cases hold mineral substances extracted from the ground and the proceeds of mineral rights are not fruits because their production results in depletion of the property. See La.Civ.Code Ann. art. 551 comment (c) and the authority cited therein. The same is true of proceeds derived from timber operations. Id., comment (b) and the authority cited therein. Nevertheless, even where not classified as a fruit, the proceeds of mineral rights may, by virtue of exceptional provisions, belong to the usufructuary or they may fall into the community of acquets and gains. See, e.g., Id., comment (c); La.Rev.Stat.Ann. § 31:188-196 (West 1989) (open mine doctrine); La.Civ.Code Ann. art. 2338-2343 (West 1985) (community property); La.Civ. Code Ann. art. 562 (West 1980) (usufructuary of timber); A.N. Yiannopoulos, Property § 42. Additionally, under certain circumstances timber may be regarded as fruits. La.Civ.Code Ann. art. 551 comment (b).

RENT
The parties do not dispute the $13,740.00 received from the lease of rental property is properly classified a civil fruit. Nor do we disagree with the court of appeal's conclusion the rental revenue "clearly falls within the parameters" of Louisiana Civil Code article 551. Doll, 577 So.2d at 804.

MINERAL LEASE PAYMENTS
In 1982 Dr. Doll executed two mineral leases granting the right to explore for and produce oil and gas on the Blanchard tract in return for bonus payments totaling $70,795.46.[12] There was never any drilling for or extraction of minerals in connection *1246 with these leases. As stated, the appellate court found it unnecessary to classify the mineral lease proceeds, concluding the payments were returnable as a resulting diminution of the value of the immovable under Louisiana Civil Code article 1264.
Mrs. Sullivan contends the mineral lease bonuses are not fruits because the mineral lease results in a diminution of the property, regardless of whether production ever ensues. Prospectively characterizing the bonus as prepayment for oil and gas, Mrs. Sullivan concludes the execution of a mineral lease necessarily implies an alienation of the minerals and thus entitles the succession to recover the value of the property at the time of Mr. Doll's death pursuant to Louisiana Civil Code article 1270 or 1260. In essence, Mrs. Sullivan depicts the bonus not as the sale of the right to explore for minerals but as the sale of the minerals themselves.
While we find Mrs. Sullivan's argument interesting, we do not find it persuasive. First, article 1270 has no application to this situation. Article 1270 contemplates the donee's having disposed of the immovable property which was given, or having caused it to be destroyed through his fault or negligence, thereby losing the option to collate in kind. See La.Civ.Code Ann. arts. 1269, 1270; L. Oppenheim, Successions and Donations § 36, in 10 Louisiana Civil Law Treatise (1973). Consequently, the donee must collate by taking less. Moreover, since destruction or deterioration of the property implies a diminution in substance, resort to articles 1270 and 1260 merely begs the question. The appropriate inquiry is whether the proceeds received for execution of the mineral leases are classified as a fruit or a product. More simply, has the bonus resulted in diminution of the Blanchard property in some manner?
Second, a brief examination of the Louisiana Mineral Code, La.Rev.Stat.Ann. § 31:1 et seq. (West 1989 and Supp.1991), further exposes the weakness of Mrs. Sullivan's argument. Ownership of land does not include ownership of oil and gas. La. Rev.Stat.Ann. § 31:6 (West 1989). Although the right to explore and develop one's property for the production of minerals, and to reduce minerals to possession and ownership, belongs exclusively to the landowner, id., he may convey, reserve, or lease this privilege. La.Rev.Stat.Ann. § 31:15 (West 1989). The mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals. La.Rev.Stat.Ann. § 31:114 (West 1989). The mineral lease is a mineral right and, consequently, an incorporeal immovable and a real right.[13] La.Rev.Stat.Ann. §§ 31:16, 31:18 (West 1989). Mineral leases are construed as leases generally and, wherever pertinent, codal provisions applicable to ordinary leases are applied to mineral leases. See La.Rev.Stat.Ann. § 31:2 (West 1989); L. McDougall. Louisiana Oil and Gas Law, § 3.1 (1991) and the authority cited therein; McCollam, A Primer for the Practice of Mineral Law Under the New Louisiana Mineral Code, 50 Tul. L.Rev. 729, 733 (1976). Accordingly, the jurisprudence holds bonus money, delay rentals, and production royalties paid under mineral leases are classified as rents. See, e.g., Melancon v. Texas Co., 230 La. 593, 89 So.2d 135 (1956); Alexander v. Alexander, 357 So.2d 1260 (La.App.2d Cir.1978). See also McCollam, Mineral Law Primer, 50 Tul.L.Rev. 729, 783 (1976). Moreover, the notion "rent" received from mineral leases is regarded in the same sense as rent received from an ordinary lease has been retained by article 123 of the Louisiana Mineral Code.[14]See Alexander, supra; McCollam, Mineral Law Primer, 50 Tul. *1247 L.Rev. 729, 783 (1976). However, because Mineral Code article 123 addresses only production royalties, delay rentals and shut-in payments, it is applicable to classification of the mineral bonus solely by analogy.
The Mineral Code defines a bonus as money or other property given for the execution of a mineral lease, except interests in production from or attributable to property on which the lease is given.[15] La.Rev. Stat.Ann. § 31:213(1) (West 1989). Although routinely paid on a per acre basis the same as other revenues realized under the lease such as royalties, the bonus is distinguishable. Compare La.Rev.Stat. Ann. § 31:213(1) (bonus) with § 31:213(4) (rental) and § 31:213(5) (royalty). See Mt. Forest Fur Farms of America, Inc. v. Cockrell, 179 La. 795, 155 So. 228 (1934) (distinguishing the bonus from payments for renewals of the lease and the royalty). Indeed, there is an absolute obligation to pay the bonus whether or not there is production.
Essentially, a bonus is the payment for the right rather than the obligation to use the property to search for minerals. Since ownership of minerals occurs only when reduced to possession, La.Rev.Stat.Ann. §§ 31:5-31:6, it follows payment of a bonus to execute a mineral lease can not be considered a dismemberment of ownership. See Milling, 220 La. at 783, 57 So.2d at 683.
Accordingly, if properly characterized at the outset, a bonus is paid simply to induce or entice the lessor to grant a mineral lease and constitutes advance consideration for the privilege of going on the land to search for oil and gas.[16] Because the mineral bonus is independent of production, and indeed by definition excludes interests in production, La.Rev.Stat.Ann. § 31:213(1), depletion of the property does not occur. Thus, a bonus, unlike a royalty, does not represent an owner's share of oil and gas. Under the plain wording of Louisiana Civil Code article 551, it is a civil fruit. See Todd, 474 So.2d at 434 n. 8 (["C]ertain mineral interests which result in the payment of bonuses ... do not so diminish the substance as to amount to a partial alienation and are quite analogous to the rentals, given as an example of `civil fruits.'")

TIMBER
Standing timber is an immovable and, unlike oil and gas, ownership of the land may or may not include ownership of the timber. Compare La.Civ.Code Ann. arts. 463, 464 (West 1980) with La.Rev.Stat.Ann. § 31:6. Ample support exists for classifying the growing timber, and the revenues derived therefrom, as a nonfruit or product. See, e.g., Harang, supra; Alexander, supra; Succession of Rugg, 339 So.2d 519 (La.App.2d Cir.1976), writ denied 341 So.2d 897 (1977); Steib v. Rathborne Land Co., Inc., 163 So.2d 429 (La.App. 4th Cir.), writ denied 246 La. 376, 164 So.2d 361 (1964); La.Civ.Code Ann. art. 551 comment (b); A.N. Yiannopoulos, Property § 42. But see La.Civ.Code Ann. arts. 560 and 562 (West 1980) (defining the circumstances under which timber and the proceeds derived therefrom are fruits belonging to the usufructuary).
However, comment (b) to art. 551 provides,
*1248 Trees are born and reborn of the soil, but they are ordinarily considered to be capital assets rather than fruits on account of their slow growth and high value. See Harang v. Bowie Lumber Co., 145 La. 96, 81 So. 769 (1919). However, trees in a tree farm or in a regularly exploited forest may be regarded as fruits, because they are produced according to the destination of the property and without diminution of its substance. See Yiannopoulos, Personal Servitudes, § 27 (1968).
Because timber sales from a tree farm would not result in a diminution of the property, revenues derived therefrom are considered fruit. While not contesting the validity of comment (b), the parties nonetheless dispute its application to this case. Specifically, the dispute centers on the applicability of the term "tree farm" to the Blanchard property, with each party declaring the comment sustains her position. Thus, whether or not the revenues derived from the timber sales constitute a fruit is dependent on whether the Blanchard property is a "tree farm," as the term is employed in comment (b). This is a question of fact, decided only impliedly by the trial court. See fn. 5, supra.
The court of appeal concluded the funds generated by timber operations on the Blanchard property constitute fruit from a tree farm. Doll, 577 So.2d at 804. For the reasons below, we find the court of appeal was correct and thus affirm the court's classification of the revenues derived from the timber operations.
In this Court Dr. Doll avers the existence vel non of a tree farm does not depend on the characterization of the land at the time the growth ensued. The proper focus, she contends, is on whether the cutting from which the revenues were gleaned was conducted "according to the destination of the property" and "without diminution of its substance" so as to facilitate replenishment. See La.Civ.Code Ann. art. 551 comment (b). Conversely, Mrs. Sullivan contends a "tree farm" necessarily implies growth resulting from a farming operation rather than natural growth existing prior to the commencement of the farming operation. Thus, Mrs. Sullivan alleges the critical consideration is the timing of the growth of the trees. Because the harvested timber was the result of 40 to 50 years unsupervised growth, Mrs. Sullivan rejects the characterization of the previously non-exploited forest land as a "tree farm." Instead, Mrs. Sullivan premises her demand for the return of the proceeds derived from the timber operations on the timber's designation as a component part of the immovable property under Louisiana Civil Code article 463.[17] Mrs. Sullivan reasons Dr. Doll is obligated to collate under Louisiana Civil Code Article 1252[18] the thing which has been given, and since the "thing" includes its component parts, viz., the timber, Dr. Doll must now account for the voluntary alienation of the "thing" or, at least, the deterioration or damage resulting to the property by her fault or negligence. See La.Civ.Code Ann. arts. 1270, 1260.[19]
We note, however, classification of standing timber as a component part of the ground does not determine ownership of the timber. See La.Civ.Code art. 463 comment (b). Moreover, Mrs. Sullivan's argument regarding "alienation" and "diminution" again, as with her contentions regarding *1249 the mineral bonuses, misses the mark by sidestepping the issue regarding the distinction between fruits and products.
The Blanchard property consisted of approximately 468 acres, of which 346 acres were naturally seeded forest and timber land and the remaining open pasture. Shortly after acquisition of the property and prior to Mr. Doll's death, Dr. Doll set into motion a plan to convert the acreage into a tree farm. Prompt inquiries were made regarding the process by which the American Forest Council certifies property as a tree farm. Shortly thereafter, Dr. Doll hired private forestry consultant Henry Bango to manage the property. Following selective marking of the trees, a bid solicitation was disseminated in July 1978. In August 1978, a bid for selective thinning was accepted. During the fall months of that year, pine seedlings were planted in the bulk of the open acreage. Discussions transpired between Dr. Doll and professional foresters leading to the certification of the property by the American Forest Council in February 1980 and identification and operation of the property as a tree farm under a master management plan. Timber sales, generating the revenue at issue, were executed in 1979, 1980 and 1981, resulting in income of $73,269.85. In mid-1980, Dr. Doll rejected a $103,000 offer to clear cut the remaining timber, evidencing an intention to manage the property to provide sustained income.
As neither the Civil Code nor the jurisprudence defines "tree farm," we look to the ordinary meaning of the phrase. Webster describes a tree farm as "an area of forest land managed in such a way as to ensure continuous commercial production under a systematic program of conservation and reforestation." Similarly, the American Forest Council, the organization which administers a national program to encourage enhanced management of forest lands (The Tree Farm System), designates tree farm as "a tract of privately owned forest managed to produce continuous crops of trees with added benefits of improved wildlife habitat, watershed protection, outdoor recreation, and aesthetic value." Bango, qualified as an expert witness in forestry and timber management, offers yet another characterization of tree farm: "A tract of land that could be planted trees or natural trees that has been managed by or under the advice of a forester, or managed by a forester where they have periodic thinnings of forest products ... so that you can get these products ... every five or six years ... without hurting the growth."
Although certification in the tree farm system is not essential to classification as a tree farm, we find persuasive the fact the Blanchard property could have qualified for the first level in the Tree Farm System from the date of acquisition. According to deponent David Lubas of the Louisiana Department of Agriculture and Forestry, the Blanchard property was properly managed as a tree farm pursuant to the American Forest Council's National Tree Farm Standards since 1978, two years prior to certification as a tree farm. Moreover, Lubas' testimony indicates a tree farm may exist even though a cutting is delayed.[20]
From the foregoing we determine designation as a "tree farm" is premised upon the existence of management techniques aimed at securing continuous production of timber, a conclusion which comports with the principle of article 551 and comment b thereto. It is clear a tree farm can not be defined by reference to its character at the time of the growth, but rather by the land's ability, through proper management techniques such as selective thinnings and plantings, to provide sustained yields. The timber sales at issue *1250 here were nothing more than selective thinnings intended to spur a fruitful and continuous yield over a prolonged stretch of time. The record provides ample support for the court of appeal's conclusion "a tree farm existed on the Blanchard property at least by August 4, 1978, the date of Charlie Doll's death." Doll, 577 So.2d at 804. That finding, therefore, remains undisturbed by this court. Accordingly, the revenues derived from the timber sales constitute a fruit.

SUBSIDY
In connection with tree replanting expenses, Dr. Doll received governmental subsidies in 1979 and 1982 totaling $2,404. This amount is neither classified a fruit nor a product; it is simply a reimbursement for out-of-pocket replanting costs expended by Dr. Doll and we need not reach the issue of collation with regard to this amount. However, according to the parties' release and settlement agreement, which agreement culminated in the Interlocutory Consent Judgment of $120,000, Dr. Doll claimed reimbursement for expense incurred for the maintenance, repair and improvement of the Blanchard property, including expenses associated with planting new trees. As the subsidy was clearly contemplated within the Interlocutory Consent Judgment, equity demands Dr. Doll return the amount to the succession. See La.Civ.Code Ann. art. 1757 (West 1987).

V.
Having clarified the classification of the proceeds, we now turn our attention to collation. The Civil Code defines collation as the supposed or real return to the mass of the succession which an heir makes of property which he received in advance of his share or otherwise, in order that such property may be divided together with the other effects of the succession. La.Civ.Code Ann. art. 1227 (West 1987). The obligation of collating is founded on the equality between direct descendants in dividing among them the succession of their ancestor and on the presumption what was given was in the nature of an advance to the donee of his hereditary portion. La. Civ.Code Ann. art. 1229 (West 1987). To assure this equality, collation is always presumed. La.Civ.Code Ann. art. 1230 (West 1987). Thus, unless the donor has expressly dispensed the donation from collation, La.Civ.Code Ann. art. 1231 (West 1987), or a statutory exception is applicable, see La. Civ.Code Ann. arts. 1244-1247, 1250 (West 1987), the descendants coming to the succession must collate what they have received from their ascendant by donations inter vivos, directly or indirectly.[21] La.Civ. Code Ann. art. 1228 (West 1987). Absent a dispensation sanctioned by the Code, courts are not free to decline to order collation based upon their assumptions about the donor's intentions. Succession of Fakier, 541 So.2d 1372, 1380 (La.1988). Indeed, the mere fact the donation was made under the guise of a contract is insufficient to indicate the intent of the ascendant to bestow an extra portion and thus dispense with collation. Champagne v. Champagne, 125 La. 408, 51 So. 440 (1910); Clark v. Hedden, 109 La. 147, 33 So. 116 (1902); Montgomery v. Chaney, 13 La.Ann. 207 (1858). In the absence of another ground for nullity, the appropriate relief for a disguised donation under article 2444 is collation. Succession of Webre, 247 La. 461, 172 So.2d 285 (1965); Clark, supra; Montgomery, supra. The advantage bestowed by the transfer is also subject to collation where the price paid is greater than one fourth but less than fair market value. See La.Civ.Code Ann. art. 1248 (West 1987). See also, Succession of Guerin, 542 So.2d 1102 (La.App. 1st Cir.1989).
Generally, collation of immovable property is made in kind or by taking less. See *1251 La.Civ.Code Ann. arts. 1251-1255 (West 1987). Collation in kind is made when the thing which has been given is delivered up by the donee to be united to the mass of the succession. La.Civ.Code Ann. art. 1252 (West 1987). The donee collating in kind is entitled to reimbursement for improvements resulting in an increase in the value of the property as well as the costs of preserving the estate. La.Civ.Code Ann. arts. 1256, 1257 (West 1987).
A distinction must be drawn between two oft-confused doctrines: the fictitious collation ordered by article 1505 and the right to demand actual or real collation. See Jordan v. Filmore, 167 La. 725, 732, 120 So. 275, 277 (1929). Fictitious collation, a simple paper return, is the method of calculating the legitime and disposable portion. Succession of Fakier, supra; L. Oppenheim, Successions and Donations § 35, at 112. Fictitious collation's remedy of reduction, predicated on the impingement of the legitime, may be demanded by forced heirs against any recipient of an excessive donation. Actual collation depends upon the existence of inequality in the disposition of the ancestor's estate and may be demanded by, and from, descendants coming to the succession. Hence, the right to demand collation and the duty to collate is reciprocal. See 3 M. Planiol, Traité Elémentaire De Droit Civil No. 2235 (11th ed. La.St.L.Inst. trans. 1959). And, whereas the test for reduction is the ultimate value of the estate, the crucial consideration in actual collation is the benefit or advantage to the heir, regardless of the depletion of the estate. Succession of Pierson, 339 So.2d 1337, 1352 (La.App. 3d Cir.1976), writ denied 342 So.2d 216 (1977). See also Succession of Fakier, supra.
Dr. Doll maintains the Civil Code does not expressly nor impliedly authorize the actual collation of the fruit of immovable property collated in kind.[22] Indeed, Dr. Doll argues her obligation to collate was satisfied by the collation in kind of the "thing which has been given" or the immovable itself. See La.Civ.Code Ann. art. 1252. She thus contends she is only obligated to restore the fruits received subsequent to the judicial demand for collation, a total of $7,810. In light of the $120,000 interlocutory consent judgment in her favor, Dr. Doll seeks judgment in her favor in the amount of $112,190.
The jurisprudence on this issue is conflicting and vague. Counsel have not pointed out, nor have we found, any cases which mandate the actual collation of the fruits of an immovable collated in kind other than Ellis v. Benedict, 408 So.2d 987 (La.App. 2d Cir.1981). Moreover, the cases discussed in brief pertaining to the "return" or restoration of the fruits of collatable property are devoid of all but analogous codal authority, and conflict regarding the date on which the obligation to return accrues.
In Clark this Court applied Civil Code article 1515 in a collation case, affirming a judgment ordering the collation of immovable property deemed a donation in disguise and the return of revenues derived therefrom from the date of judicial demand. Although article 1515 applies only to revenues from donated property subject to reduction, Clark was thereafter authority for the proposition no collation is due for revenues of property, the full ownership of which had been donated. See Osterland v. Gates, 400 So.2d 653, 658 (La. 1981); Succession of Pierson, supra; LeBlanc v. Volker, 198 So. 398 (La.App.Orl. 1940).
*1252 To the contrary are Carroll v. Succession of Carroll, 48 La.Ann. 956, 20 So. 210 (1896) and Succession of Weber, 110 La. 674, 34 So. 731 (1901). In Carroll interest was due on amounts received and to be collated by heirs from the donor's date of death. Following the reasoning in Carroll, Weber ruled the parties owed legal interest from the opening of the succession. Further, the donee owed the rents derived from the collatable property from the date of the donor's death, allowing a credit for expenses. Both Carroll and Weber were conclusory, employing neither reasoning nor codal authority. See Succession of Schonekas, 155 La. 401, 414, 99 So. 345, 349 (1924).
Moreover, to the extent Carroll and Weber held interest was due from the date of the opening of the succession, these cases were overruled by Succession of Schonekas, supra. In Schonekas we announced the proposition no interest can be claimed on cash collation until the heir, called upon to make the partition, has declined to do so. It was there stated,
The money was given as advanced portions. It was not contemplated, therefore, that it should be returned until the partition was had. It may be said that the obligation to collate it did not mature until the partition was had. It was then only that the money could be collated. In the absence of an agreement to the contrary, debts do not bear interest, except from maturity.
155 La. at 414, 99 So. at 349. See King v. King, 107 La. 437, 31 So. 894 (1902) (Unless the heir bound himself to pay interest, interest is not due on amounts brought to the mass by collating heirs.).
As stated, however, these cases are not helpful in resolving the precise problem before us. Clark, supra, is premised on reference to the distinctly dissimilar reduction action, an action entirely apart in origin and purpose from collation, and thus the decision rests upon a frail foundation. See criticism of Clark in Succession of Pierson, supra. Osterland, supra, despite reference to Clark, was concerned with legal interest on the amounts to be collated rather than with the proceeds derived from management of immovable property. Indeed, as can be readily observed from the above discussion, the supreme court jurisprudence cited by Dr. Doll, other than Clark and Weber, is concerned with judicial interest on sums to be collated or with sums due for the restitution of fruits rather than to collation of fruits of immovable property collated in kind. See Osterland, supra; Schonekas, supra; Carroll, supra; King, supra; LeBlanc, supra.
The remaining case, Ellis, supra, cited with approval by the second circuit in the instant case, specifically holds the donee is obligated to collate rental income derived from the immovable collated in kind. There the court rejected the donee's contention she must only restore rent received after demand for collation was made, and ruled the income received from the date of death must be collated.[23] The holding is premised upon the presumption in favor of collation, as well as what the court perceived as an equitable link between the right to reimbursement of expenses under Civil Code articles 1256 and 1257 and the duty to collate fruits from the date of death. See Ellis, 408 So.2d at 992 (citing Succession of Weber, supra, as authority for that proposition).
We disagree with the reasoning of Ellis. The right to reimbursement and the duty to collate fruits of an immovable collated in kind are not reciprocal. Rather, the right to reimbursement, limited as it is to expenses which preserve or improve the value of the immovable, simply serves to place the donee in a position of parity with respect to her co-heirs.
Cognizant of the dearth of jurisprudence on this issue and ever mindful of our civilian heritage, we turn now to a codal analysis and an historical excursus.
*1253 Article 856 of the Code Napoleon provides, "The fruits and revenues of things subject to collation are due only from the day on which the succession is opened." La.Civ.Code Comp. ed. in 17 LSA-CC at 756 (West 1972). The article thus exempts from collation the fruits and revenues of collatable items on the principle the donation is immediately united to the succession at the death of the donor. K.A. Cross, A Treatise on Successions (1891) at 523. The heir, however, is required to account for fruits from the opening of the succession. According to Aubry and Rau, Article 856 is premised upon the presumed intention of the donor, "whose pretended liberality would turn to the detriment of the donee, if the latter were obliged to collate, not only the thing given, but also all the fruits and income thereof." 4 Aubry & Rau, Droit Civil Français § 631, at 389 n. 43 (La.St. L.Inst. trans. 1971) (citing Demolombe, XVI, 437). See Id., § 631 at 390 n. 46 ("[T]he ... fruits paid are destined to be consumed"); 3 M. Planiol, Traité Elémentaire De Droit Civil No. 2259 at 97. ("It would often be ruinous for [the donee] if he had to return both the land and the harvest.") Indeed, Planiol posits collation was not intended to deprive the heir retroactively of at least his temporary usufruct over the collatable property. 3 Planiol, Traité Elémentaire De Droit Civil No. 2259.
Article 856 appeared as article 222 in the Civil Code of 1808. See Concordance for Code Napoleon in 17 LSA Civil Code Comp. ed. at Table 3, p. 890 (West 1972). However, article 222 was suppressed on recommendation of the redactors of the Projet of the Civil Code of 1825 with the following comment, "With regard to art. 222, relating to the fruits and revenues of things subject to collation, it has been before provided for."[24] Projet of the Civil Code of 1825 (1823) at 190, contained in Louisiana Legal Archives, Vol. I (1936).
Dr. Doll contends the final phrase of the redactors' comment regarding suppression of article 222 is more properly translated as "it has already been provided for herein."[25] She then points out the amendment of what is now article 1559, expanding the causes for revocation of donations inter vivos to include the "legal or conventional return" in paragraph (4), and the adoption of present article 1569, making the donee of the revoked donation accountable for fruits from the date of judicial demand, and the suppression of article 222 occurred simultaneously. See Projet of the Civil Code of 1825 at 190, 211; Concordance for Civil Code in 17 LSA Civil Code Comp. ed. at Table 3, p. 848. Lastly, Dr. Doll contends the redactors wrought additional changes to effectuate a harmonious revendication system in which the obligation to restore the fruits of revendicated immovables returned by either a donee, vendee, or good faith possessor accrues as of the date of judicial demand.[26] Hence, Dr. Doll suggests the redactors intended to encompass within article 1559(4) circumstances wherein the donation is revoked by collation in kind.
The court of appeal summarily concluded 1559(4) does not encompass collation, and further found application of Civil Code article 1569 confined to those causes enumerated in 1559. We find the court of appeal erred in failing to define 1559(4), one of the grounds for revocation of donations *1254 inter vivos, so as to embrace collation of an immovable collated in kind. Accordingly, we find the court of appeal also erred in failing to apply article 1569.
A donation inter vivos is defined by article 1468 as an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it. La.Civ.Code Ann. art. 1468 (West 1987). The Civil Code treats donations inter vivos in three sections, the first and second addressing general dispositions and form, respectively, and the third setting forth the exceptions to the rules respecting the irrevocability of donations inter vivos. See La.Civ.Code Ann. arts. 1523-1569 (West 1987 & Supp.1991). The causes for which donations inter vivos may be revoked are set forth in article 1559 and the donee's liability for fruits is articulated in article 1569.[27] The "legal or conventional return" enumerated as 1559(4) is the sole cause conceivably relevant to this case. To apply 1559(4), we must first determine if collation in kind is a revocation, and second, if collation in kind constitutes a legal or conventional return.
Webster defines revocation as an act of recalling or calling back. Although the donation retains its effect during the life of the donor, we find the demand for collation and the resultant return of the property in kind to be united to the mass of the succession constitutes a revocation. This conclusion is supported by the Civil Code and doctrinal materials.
It was observed by the redactors of the Projet of the Civil Code of 1825, "The donee, to whom a real estate has been given, has in it only a defeasible property, it being subject to collation." Projet of the Civil Code of 1825 at 189, concerning collation of an immovable. See 4 Aubry & Rau, Droit Civil Français § 634 at 403 (When the donor stipulates the collation must take place in kind, the heir has only a right of revocable ownership.). Accordingly, under the Code Napoleon, ownership is retroactively resolved from the date of the opening of the succession. 4 Aubry & Rau, Droit Civil Français § 634 at 403; 3 M. Planiol, Traité Elémentaire De Droit Civil Nos. 2276, 2277 (construing Code Napoleon art. 865).
The concept of revocation is embraced by the Civil Code articles pertaining to collation in kind. See La.Civ.Code Ann. art. 1227 (collation is the real return to the mass of the succession); art. 1252 (the property is united to the mass of the succession); art. 1332 (property collated in kind in an action of partition becomes united to the other effects of the successions from the moment of the donee's election to collate in kind). See also Berthelot v. Fitch, 44 La.Ann. 503, 10 So. 867 (1892). Thus, collation in kind, abolishing the right and title of the donee by the return of the property to the succession, is a revocation of a donation inter vivos.[28]
We now direct our attention to the phrase "legal or conventional return." The conventional return refers to the right of return specially reserved or stipulated in favor of the donor in the act of donation *1255 itself. See La.Civ.Code Ann. arts. 1534, 1535 (West 1987); Quirk v. Smith, 124 La. 11, 49 So. 728 (1909). Thus, the conventional return envisions a rescission of the donation by mutual consent of the donor and donee. See Liquidators of Prudential Sav. and Homestead Soc'y v. Langermann, 156 La. 76, 100 So. 55 (1924), overruled on other grounds by Bartlett v. Calhoun, 412 So.2d 597 (La.1982). Clearly, collation in kind does not manifest a conventional return.
In contrast to the conventional return, arising by agreement of act of the parties, the legal return arises by operation of law. See Atkins v. Johnston, 213 La. 458, 468, 35 So.2d 16, 20 (1948) (McCaleb, J., dissenting). Generally, the Civil Code employs the word "legal" to indicate arising or imposed by operation of law. See, e.g., La.Civ.Code Ann. art. 544 (West 1980) (legal usufruct); art. 654 (West 1980) (legal servitudes); art. 1825 (West 1987) (legal subrogation); art. 3286 et seq. (West 1973) (legal mortgage). The "legal return" articulated by article 1559(4) unquestionably includes the ascendant's right of reversion as contained in Civil Code articles 897 and 898. We are also cognizant of the fact the ascendant's right of reversion was added in the 1823 Projet, simultaneously with the adoption of articles 1559(4) and 1569.[29] However, we are not thereby compelled to confine the applicability of the "legal return" in 1559(4) to articles 897 and 898. See, e.g. Vaughn v. Coco, 409 So.2d 282 (La.App. 1st Cir.1981) (construing 1559(4) to include revocation of donations caused by separation pursuant to former La.Civ. Code art. 156 (repealed)). We also are not persuaded collation, defined in article 1227 as the supposed or real return, can not thereby also be a legal return. The supposed or real return refers simply to the manner in which the collation is made, i.e., by taking less or in kind, respectively, and does not negate the conclusion collation in kind is a legal return imposed by operation of law. See K.A. Cross, A Treatise on Successions (1891) at 505 (The definition of collation does not even describe the thing analyzed). Accordingly, we find a uniform rule for the return of fruits in all cases of revocation is best effectuated by defining legal return so as to encompass collation in kind.
A succession is opened upon the death, and all rights vest at that time. La.Civ.Code Ann. arts. 934, 940 (West 1975); Succession of Webre, 247 La. at 475, 172 So.2d at 290. From that moment, an heir may file formal succession proceedings and demand collation. Id. Collation arises from an obligation, or duty, imposed upon the heir by law. Id. at 473, 172 So.2d at 289 (citing 3 M. Planiol, Traité Elémentaire De Droit Civil Nos. 2211, 2214). Accordingly, the right and the duty of collation arise by operation of law, and collation in kind is a legal return.
Mrs. Sullivan contends 1569 is applicable only to those cases of revocation enumerated in 1559, pointing to the placement of the article for support. Because we find actual collation in kind is a "legal return," we need not reach this issue. However, even if we were to assume the "legal return" does not encompass collation in kind, we would be hesitant to construe the language of 1569, viz., "In all cases, in which the donation is revoked or dissolved," so narrowly. See e.g., Clarke v. Brecheen, 387 So.2d 1297 (La.App. 1st Cir.), writ denied 394 So.2d 606, 607 (1980) (applying by analogy art. 1569 to a donation inter vivos subject to annulment under pre-amendment art. 1533 for inclusion of a reservation of usufruct); Whited v. United States, 219 F.Supp. 947 (W.D.La.1963) (revocation of interspousal donations).
*1256 In conclusion, we find Dr. Doll's obligation to collate was satisfied by the collation in kind of the Blanchard property. She is required to collate only the Blanchard property itself and not the fruits emanating therefrom. Further, her obligation to restore the fruits derived from the Blanchard property accrues at the date of judicial demand pursuant to Civil Code articles 1559(4) and 1569, not from an obligation to collate imposed by Civil Code articles 1227, et seq.
Hence, we distinguish the donee's obligation to restore the fruits derived from an immovable previously collated in kind from the donee's obligation to collate the fruits. The distinction is crucial. The fruits emanating from a donation of an immovable which has been revoked by collation in kind must be restored only from the date of judicial demand. In contrast, not only are the fruits emanating from the immovable previously collated in kind not subject to actual collation, but actual collation of the immovable itself is due from the date of the opening of the succession.
Argument is made allowing one to restore the fruits only from the date of judicial demand thwarts collation's goal of equality among the heirs called to the succession and is unfair to deserving heirs. We also face the contention collation is the general rule and a release from collation the exception.
We observe, however, collation is not based on "deservedness" but on the ascendant's presumed intent to treat descendants equally as regards the eventual distribution of his property. See La.Civ. Code Ann. art. 1229. Thus, the remedy of collation is the means by which the civil law seeks to enforce a relatively equal distribution of the ancestor's property among descendant heirs coming to the succession. See Arsht v. Davis, 561 So.2d 58, 61 (La.1990); Estate of Schwegmann v. Schwegmann, 298 So.2d 795, 797 (La.1974).
Dr. Doll has returned to the donor's estate precisely what she received, i.e., the basic ownership of the property. See La.Civ.Code Ann. arts. 1251, 1252; Succession of Pierson, 339 So.2d at 1352. The benefits which may possibly be derived from the donation were not intended to be subject to a collation demand. See 4 Aubry & Rau, Droit Civil Français § 631; 3 M. Planiol, Traité Elémentaire De Droit Civil No. 2259. Nor is collation punitive in nature. See 4 Aubry & Rau, Droit Civil Français § 631. Moreover, this is not an instance where the coheir was ignorant of her right to demand collation. Indeed, collation is an inchoate right which must be invoked by the heirs prior to judgment of possession; otherwise, the right to demand collation is lost. La.Civ.Code Ann. art. 1242 (West 1987); Succession of Webre, supra; Doll v. Doll, 206 La. 550, 19 So.2d 249 (1944).
By this ruling we do not propose to exempt collation of every fruit in every case. In this case, neither the mineral leases nor the timber contracts were in force at the time of the donation. However, in certain circumstances the fruits themselves may constitute an advantage, as where the ascendant "bestows" the fruits or gift of revenues, rather than the immovable itself, upon the donee. In such an instance the advantage may be subject to collation. See La.Civ.Code Ann. art. 1248. Such was not the case here, and we reserve discussion for another day.

VI.
We have also considered the additional contention presented by Mrs. Sullivan and conclude it lacks merit. A donation can not be rescinded for lesion. Hamilton v. Hamilton, 522 So.2d 1356, 1358 (La.App. 2d Cir.1988). See also Owen v. Owen, 336 So.2d 782, 786 (La.1976) (The Code articles on donations apply to the disguised donation). Thus, Mrs. Sullivan's claim for breach of fiduciary duty based upon Dr. Doll's failure as executrix to bring a lesion action against herself fails.

VII.
Accordingly, judgment of the court of appeal is reversed. Judgment is now rendered *1257 ordering Dr. Doll to restore to the Succession of Charlie Doll the amount of $7,810.00 received by her subsequent to the judicial demand for collation. Judgment is further rendered ordering Dr. Doll to return to the Succession of Charlie Doll the $2,404.00 tree planting subsidy. Dr. Doll's obligations are offset against the $120,000 she is entitled to receive by virtue of the Interlocutory Consent Judgment of May 24, 1987. Final judgment is therefore rendered in favor of Dr. Paddy Doll and against the Succession of Charlie Doll in the amount of $109,786.00. Ellis v. Benedict is overruled to the extent it conflicts with the judgment rendered herein.
REVERSED AND RENDERED.
NOTES
[1] "The sales of immovable property made by parents to their children, may be attacked by the forced heirs, as containing a donation in disguise, if the latter can prove that no price has been paid, or that the price was below one-fourth of the real value of the immovable sold, at the time of the sale." La.Civ.Code Ann. art. 2444 (West 1973).
[2] Dr. Doll effectively surrendered the property to the Succession of Charlie Doll by inclusion of the property in the "Amended Descriptive List of Assets." Thus, Dr. Doll elected to collate in kind rather than by taking less. La.Civ.Code Ann. arts. 1251, 1252, 1255 (West 1987). Thereafter, Dr. Doll executed a document entitled "Reconveyance of Property in Satisfaction of Claim for Collation." The document, recorded in the conveyance records of Caddo Parish, states, "The consideration for and purpose of this conveyance is to recognize that certain deed dated and recorded on March 23, 1978 ... to have been a disguised donation and to nullify any effect of such deed, and to place record title to the described property back in the Succession of the Donor in as nearly as possible the same form and interests as before execution and recordation of such deed."
[3] The $57,803.94 expended by Dr. Doll regarding the Blanchard property from 1978-1985 includes expenses associated with travel, telephone calls, insurance, taxes, fees, and maintenance and repair. The latter includes the costs associated with purchasing and planting trees. This amount, as well as the $60,000 purchase price for the Blanchard property, was embraced within the compromise agreement.
[4] Since the date of collation in kind, December 19, 1985, all revenues have accrued to and been received by the succession.
[5] The district court determined without discussion the income at issue is a "fruit."
[6] 577 So.2d 802 (La.App.2d Cir.1991).
[7] 582 So.2d 845 (La.1991).
[8] La.Civ.Code Ann. art. 1270 (West 1987) provides: "If the donee has voluntarily alienated the immovable property which has been given him, ... or if it has been destroyed by his fault or negligence, he shall not be the less bound to make the collation of it, according to the value which the immovable would have had at the time of the opening of the succession, deducting expenses, as is provided in the foregoing article."

The preceding article, article 1269, addresses collation by taking less.
[9] La.Civ.Code Ann. art. 1260 (West 1987) states, "The donee, who collates in kind the immovable property given to him, is accountable for the deteriorations and damage which have diminished its value, when caused by his fault or negligence."
[10] Dr. Doll contends the court of appeal rejected the "diminution in value" argument insofar as the revenues accruing from the sale of timber.
[11] 1976 La. Acts, No. 103, § 1 (effective January 1, 1977).
[12] Although the court of appeal referred to the income as mineral lease payments, the $70,795.46 is properly characterized as a "bonus." See Doll, 577 So.2d at 805 (Marvin, C.J., and Norris, J., concurring). The parties have never disputed the fact Dr. Doll received this amount in exchange for the execution of the mineral leases, and both parties refer to the "bonus" in brief and in oral argument before this Court.
[13] But see L. McDougall, Louisiana Oil and Gas Law, § 3.1 (1991). ("[O]ne can view oil and gas leases as establishing real rights as to third parties but primarily personal rights as between the lessor and lessee.") (footnote omitted).
[14] La.R.S.Ann. § 31:123 reads in pertinent part, "Payments to the lessor for the maintenance of a mineral lease without drilling or mining operations or production or for the maintenance of a lease during the presence on the lease or any land unitized therewith of a well capable of production in paying quantities, and royalties paid to the lessor on production are rent."
[15] In some jurisdictions, however, production payments are considered bonuses. See McDougall, Louisiana Oil and Gas Law § 3.2, at 105 n. 45 (citing Lane v. Elkins, 441 S.W.2d 871 (Tex. Civ.App.-Eastland 1969, writ ref'd n.r.e.).
[16] Furthermore, prior to the revision of the obligations articles and the enactment of Louisiana Civil Code article 1770, the mineral bonus also served to eliminate the potestative condition of the "unless" clause contained in most mineral leases. See La.Civ.Code art. 2024 (1870). See also Sam George Fur Co., Inc. v. Arkansas-Louisiana Pipeline Co., 177 La. 284, 148 So. 51 (1933). The concept of the "potestative condition," and thus the nullity problem associated with the "unless" clause, has been eliminated by Louisiana Civil Code article 1770. L. McDougall. Louisiana Oil and Gas Law, § 3.1 (1991).
[17] At the time of the transfer to Dr. Doll, article 465 of the Louisiana Civil Code (1870) read, in pertinent part, as follows: "Standing crops and the fruits of trees not gathered, and trees before they are cut down, are likewise immovable, and are considered as part of the land to which they are attached." 1978 La. Acts. No. 728, § 1, enacting article 463, does not change the law. See La.Civ.Code Ann. art. 463 comment (a).
[18] La.Civ.Code Ann. art. 1252 (West 1987) provides, "The collation is made in kind, when the thing which has been given, is delivered up by the donee to be united to the mass of the succession."
[19] The diminution in value is measured by determining the value the property possessed at the opening of the succession, i.e., date of death. Mrs. Sullivan argues the revenues derived from the timber operations reflect the amount of "diminution" and must therefore be returned.
[20] Apparently, proper forestry management requires time and patience. As Lubas explained, "[Y]ou have got to give forest land a chance to grow, and there is a number of years in there from the time it comes up naturally or it is planted where you just can't do anything but just sit back and wait. It's a long-term investment and that (waiting before making cuttings, thinnings, or improvements) sometimes in itself is good forest management." (emphasis added).
[21] At the time of Charlie Doll's death, only forced heirs had the right to demand collation and the obligation to collate. See La.Civ.Code Ann. art. 1236 (repealed by 1990 La. Acts, No. 147, § 3, effective July 1, 1990).
[22] Dr. Doll contends the only codal provisions defining the type of distributions which must be collated are articles 1243 and 1248. The former mandates collation of "what has been expended by the father and mother to procure an establishment of their legitimate descendant coming to their succession, or for the payment of his debts." La.Civ.Code Ann. art. 1243 (West 1987). The latter orders collation of "the advantage which a father bestows upon his son, though in any other manner than by donation or legacy." La.Civ.Code Ann. art. 1248. Both articles are contained in Section 2 of Chapter 11 of Title I of Book III of the Code, entitled "To Whom the Collation is Due, and What Things are Subject to It." The remaining definitional articles in the section define what distributions are not subject to collation.
[23] In Ellis no revenues were received by the donee prior to the donor's death.
[24] "A l'égard de l' article 222, relatif aux fruits et intérêts des choses sujettes au rapport, il y a déjà été pourvu ci-dessus."
[25] While we agree that the translation of the redactors' comment is imprecise, we find the final phrase should read, "has already been provided for above."
[26] Dr. Doll directs the Court to La.Civ.Code art. 486 (possessor's rights to fruits); arts. 1408, 1409 (termination of succession partition); art. 1515 (reduction of excessive donations, where demand is made more than one year from donor's death); art. 1563 (revocation of donations for ingratitude); art. 1569 (revocation of donations inter vivos); arts. 2506, 2517, 2518 (warranty for eviction); art. 2575 (redemption); and art. 2592 (lesion). In contrast, the unworthy heir must return fruits from the date of death. La.Civ.Code Ann. art. 969 (West 1975).
[27] Article 1559 provides:

"Donation [Donations] inter vivos are liable to be revoked or dissolved on account of the following causes:
1. The ingratitude of the donee;
2. The non-fulfillment of the eventual conditions, which suspend their consummation;
3. The non-performance of the conditions imposed on the donee;
4. The legal or conventional return."
Additionally, donations inter vivos may be revoked by the mutual consent of the parties. See, e.g., Quirk v. Smith, 124 La. 11, 49 So. 728 (1909).
Article 1569 states, in pertinent part:
"In all cases, in which the donation is revoked or dissolved, the donee is not bound to restore the fruits by him gathered previous to the demand for the revocation or rescission."
[28] Of course, the conveyance to Dr. Doll, while a disguised donation, was in proper form and thus merely a relative simulation. See La.Civ. Code Ann. art. 2027 (West 1987). See also Owen v. Owen, 336 So.2d 782, 786 (La.1976); Succession of Daste, 254 La. 403, 223 So.2d 848 (1969). As a relative simulation, the transfer was susceptible to annulment pursuant to art. 2444.
[29] Present articles 897 and 898 were added in the 1823 projet and appeared in the Civil Code of 1825 as articles 904 and 906. See Projet of Civil Code of 1825 at 110 and 111; Concorde for Civil Codes in 17 LSA Civ.Code Comp. ed. at Table 3, p. 837. Article 1559(4) and 1569 were added in the 1823 projet without comment and adopted in the Civil Code of 1825 as articles 1546 and 1562, respectively. See Projet of the Civil Code of 1825 at 211; Concorde for Civil Codes in 17 LSA Civ.Code Comp. ed. at Table 3, p. 848.