UMAKVIN, Chief Judge.
In this dispute between the 89-year-old usufructuary and the 68-year-old naked owner of 143 acres of old-growth timberland in Claiborne Parish, not managed as a tree farm in more than 50 years, the naked owner devolutively appeals a judgment which, in part, authorizes the usufructuary to clear cut and replant the trees on 113 acres and to selectively cut trees from the remaining 30 acres, as initially recommended by a forester hired by the usufructuary. The judgment grants to the usufructuary all proceeds from the sale of the timber as well as the proceeds deposited into the court registry, about $32,-000, derived from the sale by the litigants, before trial, of a number of trees infested with pine beetles.
We weigh and balance the respective rights and obligations of the usufructuary and the naked owner as set forth in Civil Code articles 535-629, affirming in part and reversing in part the trial court’s judgment.
We also order the usufructuary to cease timber cutting operations on the 113-acre parcel, if such operations are in progress, and grant the naked owner the right to obtain, by agreement or by further proceedings in the trial court, an accounting and transfer of the funds the usufructuary has received for the sale of any timber cut from the 113-acre parcel after the trial court judgment was rendered. CCP Art. 2164.
Disposition of the $32,000 deposited into the court registry by the litigants is governed by their written stipulation, which we shall later discuss in this opinion.
*488 FACTS
hThe facts are largely undisputed. Walter Kennedy, who was the spouse of the usufruc-tuary and a cousin of the naked owner, owned the land for many years before he died testate and without issue in 1988. The plaintiff-spouse, Helena Babin Kennedy, and the defendant-cousin, James Kennedy, acquired their respective interests from Walter Kennedy’s testamentary bequest. At the trial in 1994, Helena was 89 years old and James was 68.
The stand of trees on 113 of 143 acres or about 80 percent of the tract, consists of loblolly pine mixed with hardwood. The trees on this parcel were estimated to be about 60-75 years old by the forestry experts who visited the property in 1992-1993. The remaining 20 percent of the tract, a 30-acre parcel that was once cultivated and farmed, contains a stand of pine trees estimated to be 45-50 years old.
As stated, no part of the 143-acre tract has been managed as a tree farm to produce regular or sustained income. Occasional “bug cuts” were made from time to time to remove a few trees infested with pine beetles, and perhaps one harvest of pine trees for “poles” was made in the late 1970’s, when the favorable market prices persuaded Walter Kennedy to sell a small amount of his timber, contrary to his often stated preference, according to relatives, to “let the timber grow.”
At the time of trial, the value of the timber on the 143-acre tract was estimated at $2,200-2,500 per acre. The value of the land itself, without the trees or planted seedlings, was generally estimated to range from $200-300 hper acre by the several experts. One expert valued the raw land at $475 per acre.
According to this record, James Kennedy has not opposed the selective cutting of timber by Mrs. Kennedy, from some or all of the 143-acre tract, at any time after Walter Kennedy’s death in 1988. James Kennedy testified, however, that when he learned of Mrs. Kennedy’s intention to clear cut the timber in April 1992 and attempted to discuss the selective cutting alternative with her, she refused to consider that option, telling him that “the deal [to clear cut and sell all of the standing timber] had ... been done.” Mrs. Kennedy brought her action for court approval to clear cut a few months later, in October 1992. She did not testify at trial.
All experts agreed that some of the timber should be cut, based on such factors as the age of the trees and the favorable market prices for pine sawlogs. The experts differed, however, as to the extent of recommended cutting: clear or total cutting v. selective cutting or thinning. Clear cutting removes all of the merchantable sawlogs at one time. A selective cut removes only the mature and diseased trees, leaving the younger and healthier trees to reach maximum growth.
Considering the advanced age of these trees, and the absence of any history of periodic timber management of the 143-acre tract, Mrs. Kennedy’s experts, Freshwater and Peters, recommended that most or all of the stand be clear cut. Freshwater, who favored clear cutting the entire tract, opined that little or no additional growth will occur if the stand is merely thinned or selectively cut. Peters, however, considered the 143-acre tract as two |4distinct parcels: 113 acres of mixed pine and hardwood, containing trees that are 60-75 years old, and 30 acres of pine trees that are 20-30 years younger, or about 45-50 years old. Peters favored selectively cutting or thinning the timber on the 30-acre parcel, while agreeing with Freshwater that the old-growth timber on the 113-acre parcel should be clear cut.
Peters and Freshwater recommended that any clear-cut areas be replanted with “genetically improved” or hybrid pine seedlings, to be purchased by Mrs. Kennedy. The replanted land would produce no merchantable timber for approximately the first 15 years, and then only lesser-paying pulpwood and chipping saw wood in years 15-30. The experts explained that 30-40 years of growth was necessary for the seedlings to grow into mature and more valuable pine sawlogs comparable to the trees on the property at Walter Kennedy’s death in 1988.
James Kennedy’s experts, Wade and Patterson, agreed that some trees throughout the 143-aere tract should be selectively cut, *489 but opposed clear cutting on any part of the tract. These experts recommended that the entire tract be selectively cut to harvest no more than 50 percent of the standing timber, leaving the rest to continue growing, as they opined it would, and to naturally seed the soil for the formation of new trees. Under a properly managed selective-cut timber plan, harvests of sawlogs are periodically rotated or staggered every few years.
Selective cutting obviously yields less immediate revenue than clear cutting, but does not totally deplete the revenue-producing potential of the property for the 15-year period needed to grow pulp- or chip-wood or for the 1530 or more years needed to grow sawlogs. Selective cutting thus provides a steadier source of income to the property owner over time, albeit in a lesser amount per harvest than the amount obtainable from a clear cut.
The trial court approved the timber management plan advanced by Mrs. Kennedy’s expert, Peters, that would clear cut the 113 acres and selectively cut the 30 acres. James Kennedy’s opposition to the court plan targets the 113-acre clear-cut provision. He does not seriously quarrel with the 30-acre selective cut. Mrs. Kennedy did not appeal or answer Kennedy’s appeal.
APPLICABLE LAW
Usufruct is a real right of limited duration on the property of another. A usufructuary’s rights vary according to the nature of the thing. CC Art. 535. At this juncture we note that the thing subject to the usufruct is simply the land, no distinction being made between the land and timber, the ownership of which may be separated. See CC Art. 491. Considering the nature of the thing subject to this usufruct, we emphasize the codal scheme.
If the thing is consumable, meaning that it cannot be used without its substance being changed or expended, the usufructu-ary, albeit temporarily, has full ownership rights, including the right to consume, alienate or encumber the thing, but subject to the obligation to deliver to the naked owner, when the usufruct ends, either the value the thing had when the usufruct began, or things of the same quantity and quality. Arts. 536, 538. Examples of consumable things are money, harvested agricultural products, stocks of merchandise, food and beverages. Art. 536.
16Nonconsumable things are those that may be enjoyed without alteration of their substance, although their substance may be diminished or deteriorated naturally by time or by the use to which they are applied, such as lands, houses, shares of stock, animals, furniture and vehicles. Art. 537. The usu-fructuary of nonconsumables may possess the things and derive the utility, profits and advantages they produce, “under the obligation of preserving their substance.” Art. 539. The obligation of preserving the substance of noneonsumable things requires the usufruc-tuary “to use them [not as the usufructuary-owner of consumable things, but] as a prudent administrator [-possessor] and to deliver them to the naked owner at the termination of the usufruct.” Art. 539.
Under these definitions, the land at issue, from which no appreciable number of trees had been cut over many decades, is clearly a nonconsumable rather than a consumable thing. With the obligation of preserving the land’s substance, the usufructu-ary-possessor’s rights are distinguished from and are less extensive than the rights of the usufructuary-owner of a consumable thing, who may consume, alienate or encumber the thing.
The usufructuary of land is entitled to the fruits, or things derived from the land without diminution of its substance. CC Arts. 550 and 551. Products of land, on the other hand, are defined as things derived from the land as a result of diminution of its substance. Art. 488. The term product generally connotes “irreversible diminution,” contrasted with the term fruit which signifies a renewable resource. Succession of Doll v. Doll, 593 So.2d 1239, 1245 (La.1992). That statement necessarily implies that diminution 17should always be relatively irreversible, depending upon the nature of the thing subject to the usufruct. See Arts. 560-562 and Revision Comments thereunder.
*490 For instance, if the owner of the land has been conducting timber operations on the land as contemplated by Art. 562 (proper [forestry] management), the later usufructu-ary of that land has the right “to continue the timber operations of the owner, and to treat as fruits the products of a regularly exploited forest [.] ” Revision Comment (b), Art. 560. We note, however, that Art. 562 does not explicitly limit the usufructuary’s right to conduct timber operations to circumstances where such operations had begun before the usufruct arose. We quote and discuss infra the full text of Arts. 560 and 562 and the legislative history of those articles.
While it may be argued that the cutting of mature sawlogs does not absolutely “irreversibly” diminish the substance of the land if seedlings are replanted, the 30-40 years necessary for the seedlings to become mature sawlogs is considerably longer than the time necessary for renewal of other things that are grown on land, such as agricultural crops. The usufructuary’s rights to cut and sell mature sawlogs [or pulpwood, for that matter] growing on the land subject to the usufruct are not absolute, according to our view of the codal scheme, but are particularly relative to how, and whether, the timber operations proposed by the usufructuary will affect the substance of the land.
Trees are generally considered to be capital assets or products of the land, rather than fruits, unless the trees are contained in a tree farm or in ajgregularly managed and exploited forest. Designation of woodlands as a tree farm is premised upon the existence of management techniques such as selective thinnings and plantings, aimed at securing continuous production of timber and sustained commercial yields. See Succession of Doll, supra, and authorities cited therein at pp. 1247-1249, including CC Art. 551 and Revision Comment (b) to that article.
When immovable property subject to a usufruct contains trees, the usufructuary’s right to cut the trees is generally limited to situations where the cutting is only for the usufructuary’s personal use or for the improvement or cultivation of the land. CC Art. 560.
The Art. 560 limitation on the usufructu-ary’s cutting of trees, is distinguished from the usufructuary’s proper management of timberlands in Art. 562, which we emphasize:
When the usufruct includes timberlands, the usufructuary is bound to manage them as a prudent administrator. The proceeds of timber operations that are derived from proper management of timber-lands belong to the usufructuary.
The legislature has not explicitly defined the terms timberlands or timber operations. The Revision Comments make it clear, however, that the article contemplates continuous production of timber, which provides the usufructuary with the security of a regular income. Comments (a), (b). The continuous production of managed timber, before or after a usufruct of land is created, does not, relatively speaking, irreversibly diminish the substance of the land, on which the remaining trees continue to grow, providing merchantable timber for later harvests, and also seeding the soil for the ^formation of new trees. The proceeds from such continuous production accrue to the owner before a testamentary usufruct is created and afterward to the usufructuary and ultimately, when the usufruct terminates, to the former naked owner of the land.
The usufructuary-possessor’s Art. 562 authority and obligation to manage the tim-berlands as a prudent administrator must be understood in the above fight and construed, not in isolation, but together with the usufructuary’s specific codal obligation to preserve the substance of the property for delivery to the naked owner when the usu-fruct ends. See Art. 539 and Comment (d) to Art. 562. Contrast, as we have done, the rights and obligations of the usufructuary-owner of a consumable thing under the codal scheme.
TRIAL COURT FINDINGS
The trial court correctly found that the Kennedy property is not a tree farm, as that term is used in the Comments to Art. 551, “because the property ha[s] not been managed to provide regular cutting or planting of timber ...” This factual finding was *491 not disputed by any witness, lay or expert, and is clearly correct.
The court, nonetheless, based its judgment on whether the old-growth trees on the land were a fruit or a product under CC Arts. 488, 550 and 551. The court classified the timber as a fruit, or a renewable resource, “because its severance does not diminish the land from which it is severed ... particularly ... where replanting [by the usufructuary] is required.” Our emphasis and brackets, and ultimate disagreement.
I ipConstruing Art. 562 in isolation, the trial court found that the property “is timberland ... which the usufructuary has a right to manage ... as a prudent administrator. [She] is entitled to the proceeds derived from [such] management.” Our emphasis and brackets. Concluding that the 113-acre clear cut and 80-aere selective cut proposed by Peters was a prudent timber management plan, the court granted authority to the usu-fructuary to implement the plan and to retain all proceeds derived therefrom.
DISCUSSION
As mentioned, the crux of the appeal concerns Mrs. Kennedy’s right to clear cut 80 percent of the land, 118 acres of the 143-aere tract, leaving the land and timber subject to the usufruct in a considerably different state than when she acquired it in 1988, some four years before she sought to clear cut the timber. James Kennedy or his heirs, of course, will acquire full ownership of the land at the usufructuary’s death.
Considering the undisputed facts we have summarized, the effect on the land if the trees on 113 acres are clear cut, and the period of several decades after replanting that will be required for the property value to return to a level comparable to the value it had when Mrs. Kennedy’s usufruct began, we must conclude that the trial court erred, both factually and legally, in the following respects:
As we have stated, the trial court erroneously construed Art. 562 in isolation, contrary to the codal scheme which requires a balancing of the respective rights and obligations of the usufructuary and naked owner of land. The code does not require an all or nothing approach. Certainly the | nusufructuary of land graced by abundant and mature trees is authorized by the code to propose a proper management plan for the land. A proper management plan must be aimed at the continuous producing of timber and sustained commercial yields that will not diminish the substance of the land, but will accrue monetarily, during the life of the usufruct to the usufructuary, and afterward to the former naked owner, as we appreciate the authorities, supra and infra.
On this record, we must conclude that the trial court erred when it found that Mrs. Kennedy’s proposed clear cutting of the mature sawlogs on 80 percent of the land will not diminish the substance of the land vis-a-vis the naked owner, James Kennedy, and that all timber on the land should be classified as a fruit belonging to Mrs. Kennedy rather than as a product owned by James Kennedy.
The facially broad language of CC Art. 562, authorizing the usufructuary of “timber-lands ... to manage them as a prudent administrator” and to retain the proceeds of prudent timber management, does not, as we shall hereafter further explain, enervate the usufructuary’s obligations to “preserve [the land’s] substance ... and to deliver [it] to the naked owner at the termination of the usu-fruct.” Art. 539.
The Comments to Art. 562 indicate that the legislature intended to strike a balance between the right of the usufructuary, on the one hand, to derive regular income from continuous timber production from the land during his or her lifetime, and on the other hand, the right of the naked |i2owner to receive the land in substantially the same income-producing form when the usufruct ends as was the form of the land when the usufruct began.
This balancing of rights between the usu-fructuary and naked owner, viewed in historical perspective, came after the initial legislation (1808-1825) granted broad authority to the usufructuary to cut timber for personal use or for sale. The initial period, however, was followed by 150 years (1825-1976) of law *492 that denied the usufructuary authority to sell timber, permitting the usufructuary to cut timber only for personal use or for construction on, or cultivation of, the land. The 1825-1976 law was considered by some to be unduly restrictive for the usufructuary of land that produces timber in commercial quantities. See A.N. Yiannopoulos, Personal Servitudes, 3 Louisiana Civil Law Treatise (3d ed. 1989), § 58, pp. 121-123.
We quote, in part, Professor Yiannopoulos: The 1808 Civil Code permitted the usufructu-ary to “cut trees on land of which he has the usufruct ... both for his use and for sale[,] provided that he act ... prudent[ly], and ... that the inheritance be not thereby rendered entirely barren or useless.” Former Art. 18, quoted in Yiannopoulos, supra, § 58, fn. 5 at p. 122. As further explained in the same footnote, the redactors of the 1825 Civil Code changed the law for these reasons:
We have thought that the power given to the usufructuary to sell the wood or earth at his pleasure might be ruinous to the owner and we have thought proper to limit his rights in this respect to what might be necessary for his own use and for that of the property.
| igSee former Art. 551, the substance of which remained unchanged from 1825-1976:
The usufructuary has a right to draw all the profits which are usually produced by the thing subject to the usufruct.
Accordingly, he may cut trees on the land of which he has the usufruct, take from it earth, stones, sand and other materials, but for his use only, and for the amelioration and cultivation of the land, provided he act in that respect as a prudent administrator, and without abusing this right. (Our emphasis.)
When the law on personal servitudes was revised by Acts 1976, No. 103, the provisions of former Art. 551 were reenacted as Art. 560, and Art. 562 was added:
Art. 560. Trees, stones, and other materials
The usufructuary may cut trees growing on the land of which he has the usufruct and take stones, sand, and other materials
from it, but only for his use or for the improvement or cultivation of the land.
Art. 562. Usufruct of timberlands
When the usufruct includes timberlands, the usufructuary is bound to manage them as a prudent administrator. The proceeds of timber operations that are derived from proper management of timberlands belong to the usufructuary.
Also included in the 1976 revision were reenactments, without substantive change, of these provisions, which we also emphasize:
—The usufructuary of a thing, such as land, is entitled to its fruits, or things produced by or derived from the land without diminution of its substance (Arts. 550 and 551); and
—The usufructuary of land, a nonconsuma-ble thing, may use the land and derive the profits and advantages it produces, under the obligation of preserving its substance. He is bound to use the land as a prudent administrator, and to deliver it to the naked owner when the usufruct ends (Arts. 537 and 539).
liiArt. 488, providing that products derived from a thing as a result of diminution of its substance belong to the owner of the thing, was adopted a few years later, by Acts 1979, No. 180. The second sentence of Art. 562 states, however, that the proceeds from “proper management of timberlands belong to the usufructuary.”
As was explained in Succession of Doll, cited supra:
... Prior to the effective date of Article 551 [January 1, 1977], the jurisprudence, as well as doctrinal materials, indicated “fruits” was construed according to the context in which the issue of classification arose ... e.g., ... usufruct ... taxation ... good faith possession_ Moreover, “products” was synonymous with fruits, leading the courts simply to differentiate fruits and non-fruits_ [A] unitary notion of fruits ensued with the enactment of article 551. ... Subsequently, the Civil Code distinguished fruits from products. See [Art.] 488 ... effective Jan. 1, 1980. *493 59B So.2d at 1244-1245. Citations and footnotes omitted; emphasis and brackets added.
Art. 562, which deals specifically with usu-fruct of timberlands, was briefly mentioned in Doll, but was not pertinent to the court’s decision concerning the classification of timber and mineral revenues for purposes of collation. The later case of Myers v. Colfax Timber Co., Inc., 93-1315 (La.App. 3d Cir. 5/4/94), 640 So.2d 513, squarely addressed Art. 562 and Doll, but reached what we consider to be an anomalous result by declaring
... that the proceeds from timber operations are considered “fruits” if harvested as a “tree farm” in the non-usufructuary context [,] and when involving a usufruc-tuary, if harvested utilizing proper management techniques as a “prudent administrator.”
No. 93-1315, p. 9, 640 So.2d at 520. Our emphasis and brackets.
Iisln Myers, all of the merchantable timber was cut from a 40-aere tract that apparently had not been managed or periodically cut in the past. The trial and appellate courts noted that the usufructuary had solicited competitive bids for the sale of the timber, had accepted the highest bid, and had received a fair price for the timber, which was cut according to “good forestry practices.” From this evidence, and without addressing whether and to what extent the timber cutting affected the substance or value of the 40 acres, the Third Circuit concluded that the usufructuary had acted prudently, and thus was entitled to all proceeds of the timber operation under Art. 562.
To the extent that Myers arguably supports the judgment we are reviewing, we respectfully decline to follow Myers. In our view, and even if the property at issue fits only the broad definition of timberland, and not the more narrowly defined term tree farm, an assessment of the usufructuary’s proposed timber operations, as a prudent administrator under Art. 562 and the other pertinent articles of the code, must necessarily entail an examination into the factual result that clear cutting the timber will have on the substance and value of the land and into the legal obligation of the usufructuary to preserve the substance of the land.
As we appreciate the codal scheme, the usufructuary of timberlands, not before managed as a tree farm, “may cut trees ... for the improvement or cultivation of the land [Art. 560],” but “is bound to manage [timber-lands] as a prudent administrator [Art. 562].” That obligation is further explained in Art. 558, when the naked owner contests the proposal of the usufructuary to affect the substance of the land, “the usufructuary may ... make ... those | improvements and alterations that a prudent administrator would make.” The legislature’s consistent use of the term administrator in these articles implies what is explicitly stated in Art. 539: The usufructuary of timberland has a fiduciary duty to preserve the substance of the land for delivery to the naked owner when the usufruct ends. These principles are reinforced in Comment (d) to Art. 562, particularly the first sentence: “Timber operations by the usufructuary should not deplete the substance of the land.”
CONCLUSION AND DECREE
This record shows that the usufructuary’s proposed clear cutting of the mature trees on 80 percent of the land will greatly diminish the value of the land for several decades, notwithstanding her intention to replant this acreage. The proposed selective cutting on the remaining 20 percent, however, is not shown to have that same effect.
We shall amend the judgment accordingly, limiting Mrs. Kennedy’s authority to cut and sell timber, and her entitlement to the sale proceeds, to a selective cutting from the 30-acre stand of younger trees on the property.
The trial court awarded Mrs. Kennedy all of the funds deposited by the litigants into the court registry, derived from the sale of small amounts of timber to remove bug-infested trees from the property. The litigants have stipulated, however, that if Mrs. Kennedy is entitled to cut only a portion of the timber on the property, she shall receive only part of the deposit, and the balance shall be paid to James Kennedy. Under the stipulation, Mrs. Kennedy’s share is to be deter *494 mined by multiplying the amount of the deposit, $82,821.77,
[i7by a fraction, the numerator of which is the value of that portion of the timber on the Usufruct Property that [Mrs.] Kennedy is entitled to cut and the denominator of which is the value of all of the timber on the Usufruct Property[.]
The specific timber values necessary to calculate the litigants’ respective shares of the deposited funds, under the stipulation, do not appear in this record. We remand the matter to the trial court for a determination, by agreement or by contradictory proceedings, of each litigant’s proportionate share of the $82,821.77.
We further order Mrs. Kennedy to cease timber operations on the 113-acre parcel, if such operations are in progress, and to render to James Kennedy an accounting and transfer of the funds she has received for the timber cut and sold from that parcel after the trial court judgment was rendered. Costs, here and below, are assessed to Mrs. Kennedy.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
SEXTON, J., concurs and assigns written reasons.